ORIGINAL
FILED

1  Royal F. Oakes (80480), roakes@barwol.com
   Michael A.S. Newman (205299), mnewman@barwol.com
2  BARGER & WOLEN LLP          2008 JUL 11  P 2: 50
   633 West Fifth Street, 47th Floor
3  Los Angeles, California 90071        RICHARD W. WIEKING
   Telephone: (213) 680-2800        CLERK, U.S. DISTRICT COURT
4  Facsimile: (213) 614-7399        NORTHERN DISTRICT OF CALIFORNIA

5  Attorneys for Defendant        E-filing
   Metropolitan Life Insurance Company

6

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  LINDA WREN, an Individual,           )  CASE NO.:
                                         )
12              Plaintiff,               )  DEFENDANT METROPOLITAN LIFE
                                         )  INSURANCE COMPANY'S **NOTICE OF**
13      vs.                              )  **REMOVAL**; DECLARATION OF
                                         )  MICHAEL A. S. NEWMAN
14  METROPOLITAN LIFE INSURANCE          )
    COMPANY; and DOES 1 through 50,      )  [On grounds of Diversity of Citizenship under
15  Inclusive,                           )  28 U.S.C. § 1332 and Federal Question under
                                         )  28 U.S.C. § 1331]
16              Defendants.              )
                                         )  Complaint filed: June 2, 2008
17 _____)

18

19

20

21

22

23

24

25

26

27

28

i:\office7\7197\240\08pleadings\01 notice of removal fed ct wren-vfinal.doc

FAXED

TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. Sections 1331, 1332, 1441 and 1446, Defendant Metropolitan Life Insurance Company ("MetLife") hereby removes Case Number SCV 242965 from the Sonoma County Superior Court to this Court. Removal of this action is proper for the following reasons:

## TIMELINESS

1.      The first date upon which MetLife received a copy through service of the Complaint and other documents in this case was June 11, 2008, when Plaintiff Linda Wren ("Plaintiff") served MetLife.

2.      This removal is thus timely under 28 U.S.C. Section 1446(b), in that removal is sought within thirty (30) days after service of the Summons and Complaint, which was the initial receipt by MetLife of a copy of the initial pleadings in this action.

## DIVERSITY JURISDICTION

3.      This action is properly removable pursuant to the provisions of 28 U.S.C. Sections 1332 and 1441(b), in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, as set forth more fully below.

1

## Citizenship

2

3    4.   Plaintiff is a citizen and resident of California, and at all relevant times has been a

4  citizen and resident of California. (Newman Decl., Exh. "A", *Complaint,* ¶ 3)

5

6    5.   A corporation is deemed to be a citizen of any State by which it has been

7  incorporated and of the State where it has its principal place of business. *United Computer*

8  *Systems, Inc. v. AT&T Corp.*, 298 F. 3d 756, 763 (9th Cir. 2002). MetLife is a corporation organized

9  and existing under the laws of the State of New York, having its principal place of business therein.

10  (Declaration of Cindy Broadwater "Broadwater Decl." at ¶ 2; Declaration of Michael A. S.

11  Newman, "Newman Decl.", Exhibit "B"). Plaintiff further admits that MetLife is not of the same

12  citizenship as Plaintiff; however, Plaintiff mistakenly alleges that MetLife is a Delaware

13  Corporation. (Newman Decl., Exh. "A", *Complaint* ¶ 4) MetLife's principal place of business is

14  also New York. (Broadwater Decl. at ¶ 2) A corporation has only one principal place of business.

15  See 28 U.S.C. Section 1332(c)(1); *see also United Computer Systems, Inc. v. AT&T Corp.*, 298 F.

16  3d 756, 763 (9th Cir. 2002). The principal place of business is the state where a "substantial

17  predominance" of corporate activity takes place, *or* where the majority of its executive and

18  administrative functions are performed. *United Computer Systems, Inc.*, *supra* at 763.  As

19  evidenced by the Broadwater and Newman Declarations and exhibit thereto, the substantial

20  predominance of MetLife's corporate activity takes place, and the majority of its executive and

21  administrative functions are performed, in New York, and outside of California. At all times

22  pertinent, the citizenship status of MetLife as a citizen of the New York has remained the same.

23  (Broadwater Decl. at ¶ 2) Accordingly, at the time of the filing of the complaint and the filing of

24  this Notice of Removal, MetLife was and is a citizen of the State of New York. (*Id.*) Furthermore,

25  MetLife's citizenship is attested to in numerous district court opinions. *Vega-Muniz v. Metro. Life*

26  *Ins. Co.*, 278 F. Supp. 2d 146, 147 (D.P.R. 2003) ("MetLife is a corporation organized and existing

27  under the laws of the State of New York with its principal place of business in New York.");

28  *Morgan v. Metro. Life Ins. Co.*, 2003 U.S. Dist. LEXIS 6540, *2 (E.D. La. 2003) ("MetLife is a

1    New York Corporation having its principal place of business in New York."); *Stensrud v. Metlife*

2    *Investors Ins. Co.*, 29 Employee Benefits Cas. (BNA) 1190, *5 (N.D. Ill. 2002) ("MetLife is a New

3    York corporation with its principal place of business in New York."); *De Dios Cortes v. Metlife,*

4    *Inc.*, 122 F. Supp. 2d 121, 124 (D. P. R. 2000) ("MetLife is a corporation organized and existing

5    under the laws of the State of New York with its principal place of business in New York.").

6

7        6.      Based on Paragraphs 4 through 5 above, and the allegations of the Complaint, there

8    is complete diversity of citizenship as between Plaintiff and Defendant.

9

10                    **Amount in Controversy**

11

12        7.      On the face of the Complaint and the declarations and exhibits attached hereto, the

13    amount in controversy is in excess of $75,000.

14

15        8.      Defendant is not required to prove in absolute terms that more than $75,000 is at

16    issue. Rather, a "defendant must provide evidence establishing that it is 'more likely than not' that

17    the amount in controversy exceeds" $75,000. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398,

18    403 (9th Cir. 1996). Here, there is no question that the amount in controversy easily exceeds

19    $75,000.

20

21        9.      In her Complaint, Plaintiff purports to seek benefits due under a Long Term

22    Disability Plan established and maintained by Plaintiff's employer California Human Development

23    Corporation ("CHDC"). While referencing "a Long Term Disability Plan," Plaintiff's claims

24    actually arise under a plan bearing the name of California Human Development Program Welfare

25    Benefit Plan (the "Plan"). (Broadwater Decl., ¶ 4, Ex. A) As Plaintiff alleges, the Plan is funded by

26    a group policy of insurance issued by MetLife to CHDC (the "Policy"). (*Id.*)

27

28        10.      Under the terms of the Plan, if found disabled, Plaintiff could be entitled to benefits

1  equaling $1,387 per month.  Although MetLife maintains that the period for which Plaintiff would

2  be entitled to benefits for the disability she alleges is subject to a limitation on benefits, the

3  maximum benefit period under the Plan spans from October 2006 to April 2013 (more than 77

4  months).  (Broadwater Decl. at ¶ 3)  Although MetLife denies that it is in fact liable for any part of

5  these amounts, or that Plaintiff could be entitled to future benefits in this action, it is beyond

6  question that the amount in controversy exceeds $75,000.

7

8      11.      In addition, Plaintiff seeks punitive damages, emotional distress, and attorneys' fees,

9  which should also be considered in determining the amount in controversy.  (Newman Decl., Exh.

10  "A", *Complaint Prayer* 3-5); *see Conrad v. Hartford Accident & Indem. Co.*, 994 F. Supp. 1196,

11  1198 (N.D. Cal. 1998) (finding that special and general damages, attorneys' fees, and punitive

12  damages are included in the calculation of the amount in controversy).

13

14                          **FEDERAL QUESTION JURISDICTION**

15

16      12.      This case is a civil action for which this Court has original jurisdiction under the

17  provisions of 28 U.S.C. Section 1331, in that this case arises under the laws of the United States

18  (namely, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Section 1001 *et*

19  *seq.*) and thus presents a federal question.  Therefore, this case may be removed to this Court by

20  MetLife pursuant to the provisions of 28 U.S.C. Section 1441(b), in that it arises under the

21  Constitution, laws or treaties of the United States as set forth more fully below.

22

23      13.      Under ERISA, an employee welfare benefit plan is "[a]*ny plan, fund, or program*

24  *which . . . is established or maintained by an employer or employee organization . . .* to the extent

25  that such plan, fund or program was established or is maintained for the purpose of providing for *its*

26  *participants or their beneficiaries through the purchase of insurance . . .* or otherwise, (A) medical,

27  surgical or hospital care or benefits *in the event of* sickness, accident, *disability or death* or

28  unemployment . . . ."  29 U.S.C. Section 1002(1) (emphasis added).

1      14.    Plaintiff's claim for long-term disability benefits is afforded solely by way of the

2  Plan sponsored by CDHC. Plaintiff's Complaint alleges, "[a]s a CHDC employee, Ms. Wren was

3  insured under a Long Term Disability Plan established and maintained by CHDC. In order to

4  effectuate the LTD Plan, CHDC secured a group insurance policy issued by MetLife, which by its

5  terms covered Ms. Wren, and other CHDC personnel against loss of income due to disability.

6  (Newman Decl. Ex. A, *Complaint*, ¶ 7) The Complaint further sets forth that Defendant "breached

7  the terms of the MetLife policy by failing and refusing to pay benefits … under the MetLife policy

8  as set forth herein." (*Id*. at ¶ 30) A true and correct copy of the Plan's governing Summary Plan

9  Description ("SPD") is attached as Exhibit "A" to the Declaration of Cindy Broadwater.

10

11      15.    Thus, it is clear from Plaintiffs' Complaint and the documents to which it refers that

12  the Plan meets all of the statutory elements for an ERISA-governed employee welfare benefit plan:

13

14          •   *plan, fund or program* = The Plan and its constituent documents, including CHDC's

15              Summary Plan Description, the relevant portions of which are attached as Exhibit

16              "A" to the Broadwater Declaration

17          •   *established or maintained* = The formation and continued existence of the Plan

18          •   *by an employer* = California Human Development Corporation

19          •   *providing various types of prescribed benefits* = Long-term Disability Benefits

20          •   *to participants or their beneficiaries* = The employees of CHDC, including Plaintiff

21

22      16.    ERISA provides the exclusive framework for addressing alleged violations of its

23  provisions, displacing all state law claims. 29 U.S.C. Section 1144; *Metropolitan Life Ins. Co. v.*

24  *Taylor,* 481 U.S. 58, 60 (1987). Specifically, ERISA is intended to ". . . supersede any and all State

25  laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C.

26  Section 1144(a). Thus, because the plan at issue in this case is an employee welfare benefit plan

27  governed by ERISA, all state law claims based on wrongful withholding of benefits or denial of

28  coverage are completely preempted by ERISA. *See, e.g., Aetna Health Inc. v. Davila,* 542 U.S.

200, 220 (2004) ("We hold that respondents' causes of action, brought to remedy only the denial of benefits under ERISA-regulated benefit plans, fall within the scope of, and are completely pre-empted by, ERISA § 502(a)(1)(B), and thus removable to federal district court."). Given the breadth of its preemption provision, Congress intended for ERISA to occupy the field with respect to employee benefit packages.

17.    As applied to this case, Plaintiff's state law cause of action undeniably "relate to" the Plan. In *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 87 (1983), the phrase "relate[s] to" was given its broad common-sense meaning, such that a state law relates to an employee welfare benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." Here, Plaintiff's state law claims have a "connection with" the Plan because the Plan is the only means by which she can recover the benefits at issue. Stated directly, Plaintiff's claims rise – or fall – with the Plan itself. But for the employee welfare benefit plan, no claims exist. In addition, Plaintiff's claims also have a "reference to" the Plan and its underlying Policy in numerous instances, in that her Complaint specifically refers to the disability coverage at issue. Lastly, the Complaint not only "refers to" and "relates to" an ERISA plan, Plaintiff's Complaint itself sets forth a cause of action to recover the disputed long-term disability benefits under an ERISA theory of recovery.

18.    While Plaintiff attempts to escape the broad scope of ERISA's preemption powers by alleging that it is eligible for treatment as a public agency and is consequently the Plan should be treated as a governmental plan to which ERISA does not apply, such allegations are misplaced. CHDC is not a governmental agency. It is registered with the State of California as a non-profit section 501(c)(3) corporation. (Newman Decl., Ex. "C," "D") Plaintiff generically alleges that CHDC qualifies as a public agency under Cal. Gov. Code § 20057(k)(2) because it provides services to governmental entities, but this is not sufficient to render CHDC a California agency, let alone exempt its longterm disability plan from ERISA. Section 20057(k)(2) only applies to a 501(c)(3) corporation that ***also***:

Operates a rehabilitation facility for the developmentally disabled and provides

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

1    services under a contract with either (A) a regional center for the developmentally
     disabled, pursuant to paragraph (3) of subdivision (a) of Section 4648 of the
2    Welfare and Institutions Code, or (B) the Department of Rehabilitation, pursuant
     to Chapter 4.5 (commencing with Section 19350) of Part 2 of Division 10 of the
3    Welfare and Institutions Code, upon obtaining a written advisory opinion from the
     United States Department of Labor as described in Section 20057.1.
4

5    Cal. Gov. Code § 20057(k)(2).  There is no indication that CHDC meets this very narrow category

6    of public agency.   Case law is clear that the mere fact that a private entity performs actions for or in

7    connection with government entities is not sufficient to render its privately-established Plan a

8    "governmental plan." *C.f. Alley v. Resolution Trust Corp.*, 984 F. 2d 1201 (D.C. Cir. 1993) (even

9    where an entity operates as an "arm" of the government, there is no governmental exemption to

10   ERISA where the entity "relates to its employees as would a private business – an entity whose

11   employees are not subject to laws governing public employees generally."); *McGraw v. Prudential*

12   *Insurance Co.*, 137 F. 3d 1253, 1257 (1998) (even where government controls actions of private

13   entity, a Plan established by the entity is governed by ERISA where private entity, not government,

14   purchased and established the Plan);  *U.S. v. Rodrigues,* 237 Fed. Appx. 178 (9th Cir. 2007) (union's

15   Plan did not fall under governmental ERISA exemption where government had no direct

16   involvement in Plan and provides minimal funds.)  Consistent with this, the Plan clearly states, by

17   its own terms, that it is an ERISA Plan, and is governed by ERISA.  The Summary Plan Description

18   contains language that it, as an ERISA Plan, is statutorily required to provide.  Under these

19   circumstances, it is clear that ERISA applies.  (Broadwater Decl., Exh. A).  Under these

20   circumstances, it is clear that ERISA applies.

21

22        19.     Accordingly, this case is governed by ERISA, as an action arising under the laws of

23   the United States, and it is properly removed to this Court under 28 U.S.C. Sections 1331 and

24   1441(b).

25

26

27

28

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

**Process**

20.    A true and correct copy of the Complaint and all other associated pleadings received by MetLife is attached to the Declaration of Michael A. S. Newman as Exhibit "A".

21.    Written notice of the filing of this Notice of Removal has been given to the adverse party, and a copy has been filed with the Clerk of the Sonoma Superior Court, in accordance with the provisions of 28 U.S.C. Section 1446(d).

WHEREFORE, Defendant prays that this action be removed to this Court.

DATED: July 11, 2008                    BARGER & WOLEN LLP

By: _____
ROYAL F. OAKES
MICHAEL A.S. NEWMAN
Attorneys for Defendant
Metropolitan Life Insurance Company

# DECLARATION OF MICHAEL A. S. NEWMAN

I, Michael A. S. Newman, declare as follows:

1.   I am an attorney licensed to practice in this Court and all the courts in the State of California, and am a partner at Barger & Wolen, LLP, counsel of record for Defendant Metropolitan Life Insurance Company ("MetLife"). I am one of the attorneys with responsibility for the handling of this matter. I have personal knowledge of the matters set forth below, and if necessary could competently testify as to such matters.

2.   Attached hereto as Exhibit "A" is a true and correct copy of the Summons and Complaint in the above-referenced action.

3.   Attached hereto as Exhibit "B" is a true and correct copy of the relevant portion of MetLife's profile in the 2007 AM Best's Insurance Report.

4.   Attached hereto as Exhibit "C" is a true and correct copy of the relevant portion of the State of California Secretary of State's website showing that California Human Development Corporation ("CHDC") is a registered corporation in the State of California.

5.   Attached hereto as Exhibit "D" is a true and correct copy of the CHDC's website showing that it lists itself as a not-for-profit corporation; not as a governmental agency.

I declare under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 11th day of July 2008, at Los Angeles, California.

MICHAEL A. S. NEWMAN

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office7\7197\240\08pleadings\01 notice of removal fed ct wren-vfinal.doc

9

# EXHIBIT A

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process**
**Transmittal**
08/11/2008
CT Log Number 513517959

**TO:**  Teresa W. Roseborough, Chief Counsel of Litigation
Met Life
27-01 Queens Plaza North, Area 12
Long Island City, NY 11101

**RE:**  **Process Served in California**

**FOR:**  Metropolitan Life Insurance Company (Domestic State: NY)

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Linda Wren, Pltf. vs. Metropolitan Life Insurance Company, et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Letter, Notice and Acknowledgment of Receipt (2 sets), Self Addressed Stamped Envelope, Summons, Complaint, Notice of Assignment, Notice of Case Management Conference and Order, Notice, Stipulation Form and (Proposed) Order, Case Management Statement Form |
| **COURT/AGENCY:** | Sonoma County, Superior Court, CA
Case # SCV242965 |
| **NATURE OF ACTION:** | Insurance Litigation - Breach of Contract - Failing and refusing to pay benefits, and failing and refusing to provide "Return to Work" services |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Regular Mail on 08/11/2008 postmarked on 06/02/2008 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days from date of mailing dated 06/02/08 - Complete acknowledgment form and return // Within 30 days after service - file an answer // 10/09/08 at 3:30 p.m. - Case Management Conference |
| **ATTORNEY(S) / SENDER(S):** | Richard Johnson
131-A Stony Circle
Suite 500
Santa Rosa, CA 95401
707-577-7422 |
| **REMARKS:** | Service was made by mail under Section 415.30 of the California Code of Civil Procedure. Enclosed is a Notice and Acknowledgment of Receipt of Summons and Complaint for your consideration. Please be aware that C T Corporation does not sign on behalf of your company. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/11/2008, Expected Purge Date: 08/16/2008
Image SOP - Page(s): 30
Email Notification, Caroline Bruno CBruno@MetLife.com
Email Notification, CTServiceof Process ctserviceofprocess@metlife.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street
Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / MV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

10


EXHIBIT A

## RICHARD JOHNSTON
Attorney at Law
131-A Stony Circle, Suite 500
Santa Rosa, California 95401
(707) 577-7422
Fax (707) 837-9532
e-mail: RichardJohnstonEsq@gmail.com

June 2, 2008

CT Corporation System
818 West Seventh Street
Los Angeles, California 90017

**Re:**    *Wren v. Metropolitan Life Insurance Company et al.*
Sonoma County Superior Court Case No. SCV 242965

Dear CT Corporation System:

Enclosed respecting the referenced case are copies of the following:

1. Complaint
2. Summons
3. Notice of Assignment to One Judge for All Purposes, Notice of Case Management Conference, and Order to Show Cause
4. Notice of Selection as Mediator in Court-Connected Mediation
5. ADR Information Sheet
6. Stipulation and Order Referring Matter to Alternative Dispute Resolution
7. Case Management Statement
8. Notice and Acknowledgment of Receipt (original and one copy)

You are being served as the designated agent for service of process for Metropolitan Life Insurance Company, which is a named defendant in the referenced action.

Also enclosed is a postage paid envelope to facilitate return of the Receipt and Acknowledgment of Receipt to my office, as described on the face of that document.

Please return the Notice and Acknowledgment of Receipt to my office within 20 days of the date of this letter in order to avoid the imposition of liability for costs of effecting formal service, pursuant to California Code of Civil Procedure §415.30.

Thank you.

Very truly yours,

Richard Johnston

RJ/jrj
enc.

11

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Richard Johnston -- SBN 124524<br>131A Stony Circle, Suite 500<br>Santa Rosa, California 95401<br><br>TELEPHONE NO.: (707) 577-7422    FAX NO. *(Optional)*: (707) 837-9532<br>E-MAIL ADDRESS *(Optional)*: RichardJohnstonEsq@gmail.com<br>ATTORNEY FOR *(Name)*: Plaintiff Linda Wren | FOR COURT USE ONLY |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma<br>STREET ADDRESS: 600 Administration Drive, Room 107J<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Santa Rosa, California 95403<br>BRANCH NAME: |

| |
|---|
| PLAINTIFF/PETITIONER: Linda Wren |
| DEFENDANT/RESPONDENT: Metropolitan Life Insurance Company et al. |

| | |
|---|---|
| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>SCV 242965 |

TO *(insert name of party being served)*: CT Corporation, agent for service of process for Metropolitan Life Insurance Company

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: June 2, 2008

Richard Johnston
(TYPE OR PRINT NAME)

▶ *(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)*

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X]  A copy of the summons and of the complaint.
2. [X]  Other *(specify)*:

Notice of Assignment to One Judge for All Purposes; Notice of Case Management Conference, and Order to Show Cause; Notice of Selection as Mediator in Court-Connected Mediation; ADR Information Sheet; Stipulation and Order Referring Matter to Alternative Dispute Resolution; Case Management Statement

*(To be completed by recipient)*:

Date this form is signed:

▶

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,<br>ON WHOSE BEHALF THIS FORM IS SIGNED)

(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF<br>ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

---

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Page 1 of 1
Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

*LexisNexis® Automated California Judicial Council Forms*

**12**

07/03/2008 17:28 FAX          MET-LIFE INVESTORS          ☑007

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Richard Johnston — SBN 124524<br>131A Stony Circle, Suite 500<br>Santa Rosa, California 95401<br>TELEPHONE NO: **(707) 577-7422**    FAX NO. *(Optional):* **(707) 837-9532**<br>E-MAIL ADDRESS *(Optional):* RichardJohnstonEsq@gmail.com<br>ATTORNEY FOR *(Name):* Plaintiff Linda Wren | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
STREET ADDRESS: 600 Administration Drive, Room 107J
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Rosa, California 95403
BRANCH NAME:

PLAINTIFF/PETITIONER: Linda Wren

DEFENDANT/RESPONDENT: Metropolitan Life Insurance Company et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>SCV 242965 |
|---|---|

TO *(insert name of party being served):* CT Corporation, agent for service of process for Metropolitan Life Insurance Company

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: June 2, 2008

Richard Johnston
(TYPE OR PRINT NAME)

▶  *Richard Johnston*
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X]  A copy of the summons and of the complaint.
2. [X]  Other *(specify):*
   Notice of Assignment to One Judge for All Purposes, Notice of Case Management Conference, and Order to Show Cause; Notice of Selection as Mediator in Court-Connected Mediation; ADR Information Sheet; Stipulation and Order Referring Matter to Alternative Dispute Resolution; Case Management Statement

*(To be completed by recipient):*

Date this form is signed:

_____                    ▶  _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |
|---|---|---|

*LexisNexis® Automated California Judicial Council Forms*



$0.420
US POSTAGE
FIRST-CLASS
FROM 95492
JUN 02 2008
stamps

Richard Johnston
Attorney at Law
131 Stony Cir Ste 500a
Santa Rosa CA 95401-9522

Richard Johnston
Attorney at Law
131A Stony Circle, Suite 500
Santa Rosa, California 95401

14

1  Richard Johnston - SBN 124524
   131-A Stony Circle, Suite 500
2  Santa Rosa, California 95401
   Telephone (707) 577-7422
3  Facsimile (707) 837-9532

4
   Attorney for Plaintiff
5  Linda Wren

6

**E N D O R S E D**
**F I L E D**

*JUN 0 2 2008*

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

7                    **SUPERIOR COURT, STATE OF CALIFORNIA**

8                              **COUNTY OF SONOMA**

9
   LINDA WREN,                            )    Case No. SCV  242965
10                                        )
                  Plaintiff,              )    **COMPLAINT**
11                                        )
         vs.                              )
12                                        )
   METROPOLITAN LIFE INSURANCE            )
13 COMPANY; and Does 1 to 50 Inclusive,   )
                                          )
14                Defendants.             )
                                          )
15 ──────────────────────────────────────

16

17       Plaintiff Linda Wren alleges:

18

19                        **Introductory Allegations**

20

21       1.     This is an insurance "bad faith" action which seeks compensatory and punitive

22  damages and equitable relief from defendants as a consequence of their unwarranted,

23  arbitrary and bad faith practices in connection with the evaluation and determination of a

24  disability insurance claim submitted by or on behalf of plaintiff Linda Wren.  On information

25  and belief, defendants had a significant motivation to act in such a manner: their erroneous

26  belief that Ms. Wren's claim was subject to the provisions of the Employee Retirement Income

27  Security Act of 1974 (ERISA), 29 USC §1001 et seq.  ERISA has been interpreted to pre-empt

28

COMPLAINT

                                    **15**

1  state law causes of action and remedies; consequently, defendants believed they could in no

2  event be held liable for extracontractual or punitive damages as a result of their conduct.

3  Defendants' claims practices in Ms. Wren's case were unduly biased against and unfair to

4  claimants, to an extent significantly more egregious than when defendants believe ERISA

5  does not apply.  There was, however, not the slightest legal justification for such treatment of

6  Ms. Wren, which, on information and belief, was motivated not by any belief in any such legal

7  justification on defendants' part, but rather on their understanding that they could engage in

8  improper conduct with impunity insofar as any exposure to extracontractual civil liability is

9  concerned.

10

11      2.      Defendants' improper actions cost Ms. Wren dearly.  Already unable to work due

12  to her disabling condition, Ms. Wren became seriously emotionally distraught when

13  defendants wrongfully denied her claim and refused to provide contractually required

14  vocational rehabilitation services with no reasonable basis for their bad faith conduct, causing

15  Ms. Wren to experience, among other things, worry, distress, anger, frustration, and severe

16  anxiety.

17

18                          **Factual Background**

19

20      3.      Ms. Wren resides in Sonoma County.  The contract upon which this action is

21  based was entered into in Sonoma County, and performance of defendants' contractual

22  obligations was due in Sonoma County.

23

24      4.      On information and belief, defendant Metropolitan Life Insurance Company

25  (MetLife) is, and at all relevant times was, a corporation duly organized and existing under

26  and by virtue of the laws of the State of Delaware, and was and is authorized to transact, and

27  was and is transacting, the business of insurance in this state.  MetLife was the insurer of the

28

COMPLAINT

16

1    group disability insurance policy under which Ms. Wren sought, and was wrongfully denied,

2    benefits.

3

4       **5.**      Ms. Wren is ignorant of the true names and capacities of the defendants sued

5    under the fictitious names of Does 1 through 50. Ms. Wren will amend this complaint to show

6    their true names and capacities when the same have been ascertained, in accordance with

7    Code of Civil Procedure section 474. Ms. Wren is informed and believes that each of the

8    fictitiously named Doe defendants is legally responsible in some manner for the occurrences

9    alleged and that Ms. Wren's damages, as alleged, were proximately caused by these

10   defendants' acts and/or omissions.

11

12      **6.**      Each defendant was the agent, servant, and employee of the other defendants

13   and was acting within the course and scope of his agency or employment, and with the

14   knowledge and consent of his principal or employer.

15

16      **7.**      At relevant times, Ms. Wren worked as human resources director at California

17   Human Development Corporation ("CHDC") in Santa Rosa, California. As a CHDC employee,

18   Ms. Wren was insured under a Long Term Disability Plan (LTD Plan) established and

19   maintained by CHDC. In order to effectuate the LTD Plan, CHDC secured a group insurance

20   policy issued by MetLife ("MetLife policy"), which by its terms covered Ms. Wren, and other

21   CHDC personnel, against loss of income due to disability.

22

23      **8.**      CHDC is, and at all relevant times was, a not-for-profit corporation authorized to

24   carry out certain responsibilities of the State of California and of the United States. Examples

25   of its government-function activities include the following: CHDC operates a rehabilitation

26   facility on behalf of the California Department of Developmental Services; it provides

27   occupational and placement services on behalf of the United States Department of Labor and

28

---

COMPLAINT

1  the California Department of Employment Development and California Department of

2  Community Services and Development; it provides services on behalf of California's judicial

3  system, including criminal diversion programs and conditional sentencing educational

4  programs, and court-ordered on-site drug testing for convicted offenders. With specific regard

5  to the provision of employment benefits to its employees, CHDC is eligible for treatment as a

6  public agency pursuant to Government Code §20057(k)(2). CHDC is, consequently, an

7  agency or instrumentality of the governments of, among others, the State of California and the

8  United States, and/or of certain political subdivisions thereof. This action is not subject to

9  ERISA since CHDC's benefit plan under which the MetLife policy affords coverage to Ms.

10  Wren is therefore a governmental plan as defined in 29 USC §1002(32), to which ERISA does

11  not apply pursuant to 29 USC §1003(b)(1).

12

13      9.      According to the terms of the MetLife policy, MetLife, after a 90-day Elimination

14  Period, agreed to pay Ms. Wren a monthly benefit of 66.67% of her Predisability Earnings, to a

15  maximum of $3,000 per month, subject to certain designated benefit offsets but in no event

16  less than $100 per month, should she become and remain disabled under the terms of the

17  MetLife policy.

18

19

20      10.     The MetLife policy also provided ancillary benefits, including a "Return to Work

21  Program," which encompassed the following:

22          As a covered Employee you are automatically eligible to participate in our Return to
23          Work Program. The Program focus is vocational rehabilitation, which means identifying
            the necessary training and therapy that can help you return to work. In many cases, this
24          means helping you return to your former occupation, although rehabilitation can also lead
            to a new occupation which is better suited to your condition and makes the most of your
25          abilities.

26

27      11.     In March 2005, Ms. Wren was diagnosed with depression. Her condition

28  rendered Ms. Wren unable to perform the material duties of her occupation for a period of time

COMPLAINT                                        18

1    exceeding the 90-day Elimination Period set forth in the MetLife policy and thereafter to the

2    present time. Consequently, Ms. Wren was and is considered to be disabled under the plain

3    terms of the MetLife policy.

4

5        12.    On or about June 30, 2005 Ms. Wren completed submission of her proof of claim

6    to MetLife relating to her claim for disability benefits under the MetLife policy, in connection

7    with which she advised MetLife that her condition precluded her from performing the material

8    and substantial duties of her occupation. Accompanying Ms. Wren's claim was an "Attending

9    Physician's Statement" completed by Nancy A. Davidson, M.D., Ms. Wren's treating physician.

10   In this statement, Dr. Davidson advised MetLife of Ms. Wren's diagnosis, and of the

11   restrictions and limitations as a function thereof which precluded Ms. Wren from working.

12   MetLife failed and refused to offer or provide to Ms. Wren, at that time or thereafter, the

13   services described in the "Return to Work Program" section of its policy, despite repeated

14   emphatic requests for such services from Ms. Wren and her medical providers.

15

16

17       13.    On or about October 19, 2005, Prudential approved Ms. Wren's's claim, and

18   commenced payment of LTD benefits.

19

20       14.    On October 11, 2006, MetLife terminated Ms. Wren's LTD benefits, asserting her

21   condition had improved and that she was no longer disabled under the terms of the MetLife

22   policy. The termination of LTD benefits by MetLife was wrongful and contrary to the provisions

23   of the MetLife policy and the information known to and available to MetLife at the time.

24

25

26       15.    On October 23, 2006, pursuant to the terms of the MetLife policy, Ms. Wren

27   submitted an administrative appeal of the decision by MetLife to terminate her LTD benefits .

28   and its refusal to provide "Return to Work" services. In connection with the appeal, she

COMPLAINT

19

submitted a letter from her treating psychologist advising MetLife that her condition had not improved to the point where she could resume her occupational duties and that she remained disabled.

16.    On February 9, 2007, MetLife denied Ms. Wren's appeal.  This decision was wrongful and contrary to the provisions of the MetLife policy and the information known to and available to MetLife at the time.

17.    Ms. Wren has exhausted all administrative remedies available to her under the terms of the MetLife policy, to no avail, in that MetLife has persisted in its improper and wrongful termination of Mr. Wren's LTD benefits and in its refusal to provide "Return to Work" services.

18.    As a consequence of the improper termination of LTD benefits by defendants, Ms. Wren, among other things, has become seriously emotionally distraught, in that she experienced, among other things, worry distress, anger, frustration, and severe anxiety.

19. As a consequence of MetLife's wrongful failure to provide "Return to Work" services, Ms. Wren's ability to become rehabilitated and resume employment has been unduly compromised, as a result of which she has been compelled to accept employment which entails a much lower level of responsibility and a much lower level of remuneration than would have otherwise been available to her had "Return to Work" services been provided as the MetLife policy required of MetLife.  As a further consequence thereof, Ms. Wren, among other things, has become seriously emotionally distraught, in that she experienced, among other things, worry, distress, anger, frustration, and severe anxiety.

COMPLAINT                                          20

**First Cause of Action**
**Against MetLife and Does One through Thirty-Five**
**For Breach of the Implied Covenant of Good Faith and Fair Dealing**

20.   Ms. Wren refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this cause of action.

21.   MetLife and Does One through Thirty-five, and each of them, have breached their duty of good faith and fair dealing owed to Ms. Wren in the following respects:

(a)   Unreasonably and in bad faith failing to make disability payments to Ms. Wren at a time when said defendants knew that Ms. Wren was entitled to the payments under the terms of the MetLife policy.

(b)   Unreasonably withholding payments to Ms. Wren in bad faith knowing Ms. Wren's claim for benefits under the MetLife policy to be valid.

(c)   Unreasonably misrepresenting to Ms. Wren that she was not entitled to benefits under the terms of the MetLife policy when, in fact, Ms. Wren was unable to perform the material duties of her regular occupation and was, therefore, entitled to said benefits.

(d)   Failing to reasonably and promptly investigate and process Ms. Wren's claim for benefits, for had said defendants done so they would have reasonably determined that Ms. Wren was unable to perform the material duties of her regular occupation and was, therefore, entitled to said benefits.

(e)   Not attempting in good faith to effectuate a prompt, fair and equitable settlement of Ms. Wren's claim for benefits when liability on said defendants' part had become reasonably clear.

(f)   Conducting a biased search for one-sided facts, instead of a reasonable, impartial, objective investigation.

(g)   Violating the California Code of Regulations as applicable to the processing and adjudication of insurance claims.

(h)   Basing its resolution of Ms. Wren's claim on outdated, incomplete, and misleading information.

(i)   Failing to objectively evaluate the information available to it, and crediting only

07/03/2008 17:29 FAX                    MET-LIFE INVESTORS                    ☒016

1    information which, viewed in isolation, might support denial of Ms. Wren's claim, while
2    ignoring or discounting information which supported her claim.

3    (j)    Ms. Wren is informed and believes and thereon alleges that said defendants have
      breached their duty of good faith and fair dealing owed to Ms. Wren by other acts or
4    omissions of which Ms. Wren is presently unaware and which will be shown according to
      proof at the time of trial.
5

6    **22.**    As a proximate result of the aforementioned unreasonable and bad faith conduct

7    of said defendants, Ms. Wren has suffered damages under the MetLife policy, plus interest,

8    and other economic and consequential damages, for a total amount to be shown at the time of

9    trial.

10

11

12    **23.**    As a further proximate result of the aforementioned wrongful conduct of said

13    defendants, Ms. Wren has suffered anxiety, worry, humiliation, and mental and emotional

14    distress, all to her general damage in a sum to be determined at the time of trial.

15

16    **24.**    As a further proximate result of the aforementioned wrongful conduct of said

17    defendants, Ms. Wren was compelled to retain legal counsel to obtain the benefits due under

18    the MetLife policy. Therefore, said defendants are liable to Ms. Wren for those attorney fees,

19    witness fees and costs of litigation reasonably necessary and incurred by Ms. Wren in order to

20    obtain the MetLife policy benefits in a sum to be determined at trial.

21

22    **25.**    Said defendants intended to cause injury to Ms. Wren or this despicable conduct

23    was carried on with a willful and conscious disregard of Ms. Wren's rights or subjected Ms.

24    Wren to cruel and unjust hardship. This conduct constituted an intentional misrepresentation,

25    deceit, or concealment of material fact known to said defendants with the intention to deprive

26    Ms. Wren of property, legal rights or to otherwise cause injury such as to constitute malice,

27    oppression or fraud under Civil Code §3294. Therefore, Ms. Wren is entitled to punitive

28

COMPLAINT

22

1    damages in an amount appropriate to punish or set an example of said defendants.

2

3        26.    Said defendants' conduct described herein was undertaken by said defendants'

4    officers or managing agents, who were responsible for claims supervision and operations,

5    underwriting, communications and/or decisions. The aforementioned conduct of said

6    managing agents and individuals was undertaken on behalf of said defendants. Said

7    defendants had advance knowledge of the actions and conduct of said individuals and/or such

8    conduct was ratified, authorized and/or approved by and on behalf of said defendants.

9

10

11       27.    Disabled persons such as Ms. Wren are substantially more vulnerable than other

12   members of the public to said defendants' conduct because of poor health or infirmity,

13   impaired understanding, restricted mobility, or disability. Said defendants knew, or should

14   have known, that their unfair or deceptive acts and practices were directed to Ms. Wren, a

15   disabled person, and that Ms. Wren would suffer substantial physical, emotional or economic

16   hardship as a result. As a proximate result of said defendants' conduct Ms. Wren has suffered

17   one or more of the following: loss or encumbrance of a primary residence, principal

18   employment, or source of income; substantial loss of property set aside for retirement, or for

19   personal or family care and maintenance; or substantial loss of assets essential to the health

20   or welfare of the disabled person, thereby entitling Ms. Wren to treble punitive damages

21   pursuant to Civil Code §3345.

22

23                            **Second Cause of Action**
24              **Against MetLife and Does One through Thirty-Five**
25                            **For Breach of Contract**

26

27       28.    Ms. Wren refers to each and every foregoing paragraph of this complaint and

28   incorporates those paragraphs as though set forth in full in this cause of action.

---
COMPLAINT
                                    23                            •

29.    Defendants MetLife and Does One through Thirty-five, and each of them, owed contractual duties and obligations to Ms. Wren under the MetLife policy.

30.    Said defendants, and each of them, breached the terms and provisions of the MetLife policy by failing and refusing to pay benefits, and failing and refusing to provide "Return to Work" services, under the MetLife policy as set forth herein.

31.    As a direct and proximate result of said defendants' conduct and breach of their contractual obligations, Ms. Wren has suffered damages to be determined according to proof at the time of trial.

### Third Cause of Action
#### In the Alternative
#### Against MetLife and Does Twenty-Six through Fifty
#### To Recover Benefits Due Under an ERISA Plan
#### And to Enforce Rights Under an ERISA Plan
#### Pursuant to 29 USC §1132(a)(1)(B)
#### And Attorney Fees and Costs Pursuant to 29 USC §1132(g)

32.    Ms. Wren refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this cause of action.

33.    Ms. Wren asserts this cause of action in the alternative to the preceding causes of action. Ms. Wren maintains her claims are not subject to ERISA, inasmuch as CHDC was and is an agency or instrumentality of government, rendering its employee benefit plans ERISA-exempt governmental plans are alleged above. Ms. Wren therefore asserts this cause of action only in the alternative, in case her legal contentions respecting the applicability of

07/03/2008 17:30 FAX          MET-LIFE INVESTORS                    ☑019

California state law should be held to be without merit.

**34.** The court has subject matter jurisdiction over this alternative cause of action pursuant to 29 USC §1132(e)(1).

**35.**     As a direct and proximate result of the improper acts and/or omissions of the various defendants as herein alleged, Ms. Wren has had benefits wrongfully withheld from her under the terms of the LTD Plan and MetLife policy and has been wrongfully deprived of vocational rehabilitation services defendants were obligated to provide to her under the terms of the LTD Plan and MetLife policy.

**36.**     As a direct and proximate result of the improper acts and/or omissions of the various defendants as herein alleged, Ms. Wren has been compelled to incur reasonable attorney fees and other costs associated with the investigation of her claim and the prosecution of this action.

WHEREFORE Ms. Wren prays for judgment against defendants and each of them as follows:

AS TO MS. WREN'S FIRST CAUSE OF ACTION AGAINST METLIFE AND DOES ONE THROUGH THIRTY-FIVE FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING:

**1.**     Damages for failure to provide benefits under the MetLife policy, plus interest, including pre- and post- judgment interest, and other economic and consequential damages

COMPLAINT

25

1   according to proof;

2       **2.**     General damages for mental and emotional distress according to proof;

3       **3.**     For attorney fees and costs of litigation incurred by Ms. Wren to obtain the policy

4   benefits according to proof;

5
        **4.**     Punitive and exemplary damages in an amount appropriate to punish or set an
6   example of defendants;

7
8       **5.**     Treble punitive damages pursuant to Civil Code section 3345;

9       **6.**     For costs of suit incurred herein; and

10      **7.**     For such other and further relief as the court deems just and proper.

11

12
        AS TO MS. WREN'S SECOND CAUSE OF ACTION AGAINST METLIFE AND DOES
13  ONE THROUGH THIRTY-FIVE FOR BREACH OF CONTRACT:

14

15

16      **8.**     Damages under the policy according to proof;

17      **9.**     Damages for mental and emotional distress according to proof;

18
        **10.**    For costs of suit incurred herein; and
19
        **11.**    For such other and further relief as the court deems just and proper.
20

21

22      AS TO MS. WREN'S THIRD CAUSE OF ACTION, IN THE ALTERNATIVE, AGAINST

23  METLIFE AND DOES TWENTY-SIX THROUGH FIFTY FOR BENEFITS DUE UNDER AN

24  ERISA PLAN AND TO ENFORCE RIGHTS UNDER AN ERISA PLAN:

25

26
        **12.**    An award of all disability benefits wrongfully withheld from her under the terms of
27
    the LTD Plan and the MetLife policy, with pre-judgment and post-judgment interest thereon;
28

COMPLAINT

**13.**    An order enforcing her rights under the terms of the LTD Plan and MetLife policy, requiring MetLife to provide vocational rehabilitation services to her as provided in the MetLife policy;

**14.**    An award of attorney fees, interest and costs as authorized by statute;

**15.**    For such other relief as the court deems proper.

Dated: May 29, 2008

_Richard Johnston_
Richard Johnston
Attorney for Plaintiff
Linda Wren

COMPLAINT

27

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Metropolitan Life Insurance Company
AND DOES 1 THROUGH 50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Linda Wren

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**ENDORSED
FILED**

JUN 0 2 2008

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Sonoma County Superior Court<br>600 Administration Drive, Room 107J<br>Santa Rosa, California 95403 | **CASE NUMBER:**<br>*(Número del Caso):*<br>SCV 242965 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Richard Johnston; 131A Stony Circle, Suite 500; Santa Rosa, California 95401; (707) 577-7422

**DATE:**
*(Fecha)*   JUN 0 2 2008

DENISE L. GORDON

Clerk, by _____ JENNIFER ELLIS _____ , Deputy
*(Secretario)*                                              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
LexisNexis® Automated California Judicial Council Forms

---

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA | (FOR COURT USE ONLY) |
|---|---|
| CIVIL DIVISION<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878<br>(707) 521-6500<br>www.sonomasuperiorcourt.com | **E N D O R S E D<br>F I L E D**<br><br>JUN 0 2 2008<br><br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA |

| NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,<br>NOTICE OF CASE MANAGEMENT CONFERENCE,<br>and ORDER TO SHOW CAUSE | Case number:<br>SCV 242965 |
|---|---|

## A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT AND WITH ANY CROSS-COMPLAINT

1. **THIS ACTION IS ASSIGNED TO HON. ___ROBERT S. BOYD___ FOR ALL PURPOSES.**
   Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear below the number of the case and the nature of the paper on the first page of each paper presented for filing.
2. A Case Management Conference has been set at the time and place indicated below:

| Date: OCT 0 9 2008 | 3035 CLEVELAND AVE STE 200 | Time: 3:30p | Courtroom: 21 |
|---|---|---|---|
| Location: | SANTA ROSA CA 95406 | | |

3. No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement [Judicial Council form #CM-110] and serve it on all other parties in the case. In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.
4. At the conference, counsel for each party and each self-represented party must appear personally or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and must be prepared to discuss and commit to the party's position on the issues listed in California Rules of Court, Rule 3.727.
5. Pre-approved dispositions are recorded three (3) court days prior to the case management conference. These may be obtained by calling (707) 521-6883 or by going to http://www.sonomasuperiorcourt.com/tentative/index.php.

### ORDER TO SHOW CAUSE

To Plaintiff(s), Cross-complainants, and/or their attorneys of record:
If, on the date shown above, you are not in compliance with timely filing requirements stated in California Rules of Court, Rules 3.110 and/or 3.725, you must then and there show cause why this Court should not impose monetary and/or terminating sanctions.

29

---

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name & Address): | FOR COURT USE ONLY |
|---|---|
| Telephone No.:                          FAX No.: | |
| ATTORNEY FOR (Name):                    Bar No. | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 Administration Drive<br>Santa Rosa, CA 95403<br>Telephone: (707) 521-6500 | |
| PLAINTIFF(S)/PETITIONER(S): | |
| DEFENDANT(S)/RESPONDENT(S): | CASE NUMBER: |

## NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION
(Sonoma County Superior Court Local Rule 16)

**Name of Mediator Selected:** _____

**PLEASE TAKE NOTICE** that the above-referenced matter is subject to Sonoma County Superior Court Local Rule 16 (Rules Applicable to Alternative Dispute Resolution (ADR)). The parties have selected you to serve as the mediator in this matter. Sonoma County Superior Court has a voluntary, market rate mediation program. All mediations conducted in cases covered by Local Rule 16 are court-connected mediations and are subject to the provisions of California Rules of Court, Rules 3.850 et seq. It is your obligation to familiarize yourself with Local Rule 16 and California Rules of Court, Rules 3.850 et seq. before the mediation. **PLEASE NOTE:** you are required to have the parties complete an Attendance Sheet for Court-Program Mediation of Civil Case (Alternative Dispute Resolution) (Judicial Council form ADR-107) in accordance with California Rules of Court Rule 3.860. The form is available at the web site of the California Courts www.courtinfo.ca.gov.

If you <u>are not</u> a member of the Sonoma County Superior Court panel of mediators, in order to serve as mediator in this case, you must complete the acceptance below (see CRC Rule 3.851(a) (2)), sign it in the space provided, and file the completed Notice *with your original signature* with the Court not less than five days before commencement of the mediation. Please also provide a courtesy copy of the completed and signed Notice to the ADR Program Coordinator, 1450 Guerneville Road, Building G, Santa Rosa, California 95403 or by facsimile transmission to (707) 521-6756.

If you are mediating a case referred to court-connected mediation during calendar year 2007, regardless of the date of the mediation, you are required to complete and return a Mediator's Questionnaire (Sonoma County Superior Court Local form CV-36) within five (5) days after completion or other termination of the mediation. The completed questionnaire may be mailed or faxed to ADR Program Coordinator at the above address or FAX number. The plaintiff should provide the Mediator's Questionnaire to you. The questionnaire is also available on the web site of the Sonoma County Superior Court www.sonomasuperiorcourt.com.

If you have any questions regarding your selection or service as a mediator in this matter or about the Sonoma County Superior Court ADR Program, please feel free to contact the ADR Program Coordinator at (707) 561-6500 or ADR@sonomacourt.org.

### MEDIATOR'S ACCEPTANCE

I, _____ hereby agree to mediate the above-captioned matter subject to
(print name)

the conditions stated in this notice.

**30**

Dated: _____    _____
(Mediator's Signature)

CV-35[Revised 1/1/08]    **NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION** Page 1 of 1

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |

| ADR INFORMATION SHEET<br>[Sonoma County Superior Court Rules, Rule 16] | CASE NUMBER: |
|---|---|
| (Check one): ☐ UNLIMITED CASE    ☐ LIMITED CASE<br>(Amount demanded exceeds    (Amount demanded is<br>$25,000)    $25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

## NOTICE TO ALL PARTIES AND THEIR ATTORNEYS

The policy of the Sonoma County Superior Court is:
"The formal litigation of legal claims and disputes is expensive and time consuming. The overall results achieved by some or all of the parties are often unsatisfactory. There are many modern alternatives to formal court litigation which are less expensive, less time consuming, and more beneficial to the parties. It is therefore the firm policy and goal of this court to encourage the parties in all civil cases to explore and pursue private dispute resolution alternatives at the earliest possible date." (Local Rule 16.1.)

Although most (90-98%) cases do settle, many settlements come only after a considerable amount of time, money, and resources have been expended. Such expenditures, as well as the adversarial nature of litigation, can be a disincentive to settlement. The Sonoma County Superior Court encourages the use of Alternative Dispute Resolution (ADR) as early as possible after the parties become aware of a dispute.

Most ADR processes are voluntary and are paid for by the parties themselves, but ADR has proved in many cases to be faster, cheaper, and more effective than traditional litigation.

## ADVANTAGES OF ADR:

The filing of your complaint or answer may be just the beginning of the costs that you will incur during the course of your lawsuit. Lawsuits can be extremely costly. By utilizing ADR methods early in the course of your case, you may significantly reduce these costs by either resolving the case before expensive discovery and trial proceedings are commenced or by narrowing the scope of your discovery by identifying disputed and undisputed factual and legal issues.

ADR can be a fast, economical, and effective way to resolve civil cases, and most litigants report satisfaction with the process. ADR procedures can be scheduled at your convenience and can be completed in a fraction of the time required for traditional litigation. The cost of ADR will depend on the procedure and the provider you select, and the cost is typically less than litigation.

Most ADR processes are confidential but can result in enforceable agreements. Many ADR processes will give you an opportunity to test the strengths and weaknesses of your case without adverse impact in the event of a trial. Depending upon the method of ADR you select, it may be the last chance for you to control the outcome of your dispute before you place the decision in the hands of a judge or jury.

## METHODS OF ADR:

**A. MEDIATION:** Mediation is one of the most frequently used methods of ADR because it is informal, quick, convenient and confidential. In this process the parties select a neutral mediator who facilitates the identification of issues and areas of agreement and assists in finding a resolution or settlement of the dispute. Since mediation requires the agreement of the parties to resolve the matter, control of the proceedings and a determination of the settlement terms remains completely in the parties' hands. The mediator remains neutral and assists the parties in arriving at terms that are mutually agreeable.

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**B. ARBITRATION:** The parties jointly employ a neutral third party or a panel of neutrals to listen to both sides and render a decision. The parties are free to make the arbitrator's decision binding or non-binding. When non-binding, the arbitrator's decision serves as guide or influence upon the parties to bring them closer to settlement. If it is binding, the decision of the arbitrator will be final and generally avoids any further proceedings in the case. Non-binding judicial arbitration may be ordered in certain cases before trial.

**C. EARLY NEUTRAL EVALUATION:** A neutral evaluator is hired by the parties to give an evaluation of the case to help settle it. You or your attorney will be permitted to prepare a written statement, present critical witnesses or other evidence, argue your case to the evaluator, meet separately and confidentially with the evaluator, and utilize the evaluator to communicate any settlement offers to the opposing party.

**D. PRIVATE SETTLEMENT CONFERENCE:** A voluntary settlement conference is similar to early neutral evaluation in that the parties employ a neutral settlement officer who attempts to persuade the parties to accept a compromise position. It is a form of facilitated negotiation in which the settlement officer may express an opinion about the value of the case, the substantive merits of each party's position, and the probable outcome of the trial.

There are various other methods or combinations of methods of ADR, such as summary jury trial, mini-trial, special master and discovery referee. The court encourages the parties to be creative in selecting the process which has the best chance of resolving the case as quickly, effectively, and inexpensively as possible. You will have a chance to review your ADR options at the time of the Early Mediation and Case Management Conference.

The undersigned party is willing to agree to any of the following forms of ADR at this time (for family law and probate actions only). Your selection will inform the other parties in the case of your current thoughts regarding the use of ADR. If all parties agree on a particular ADR method, you will be asked to file a stipulation on the court's form. The stipulation form (Sonoma County Superior Court form #MISC-101) can be found at the court's web site and is available at the court.)

| | | | |
|---|---|---|---|
| ☐ | Mediation | ☐ | Early Neutral Evaluation |
| ☐ | Non-binding Private Arbitration | ☐ | Binding Private Arbitration |
| ☐ | Voluntary Settlement Conference | ☐ | Summary Jury Trial |
| ☐ | Other _____ | ☐ | Judicial Arbitration |

I / We certify that I / We have read and understood (or have had explained to me / us) the foregoing.

Date: _____        _____
                                          Signature of Party

Date: _____        _____
                                          Signature of Party

Date: _____        _____
                                Signature of Attorney for Party
                             ☐ Additional signatures are attached

**NOTE: This form requires the signatures of the parties and their attorney. All parties must complete, file and serve this form in accordance with Sonoma County Superior Court Rules, Rule 16. See Rule 16.3 for specific filing and service instructions.**

32

| CV-2 [Rev. July 1, 2004] |  | ADR INFORMATION SHEET | | Page 2 of 2 |
|---|---|---|---|---|

 

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO :             FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 |
|---|

| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: |
|---|

| STIPULATION AND ORDER REFERRING MATTER TO ALTERNATIVE DISPUTE RESOLUTION | CASE NUMBER: |
|---|---|

| (Check one):  ☐  **UNLIMITED CASE**<br>(Amount demanded exceeds $25,000) | ☐  **LIMITED CASE**<br>(Amount demanded is $25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |
|---|---|---|

The parties hereby stipulate to refer the case to the following Alternate Dispute Resolution Process:

☐ Mediation                          ☐ Non-binding Private Arbitration
☐ Binding Private Arbitration        ☐ Private Settlement Conference
☐ Early Neutral Evaluation           ☐ Judicial Arbitration

The ADR process will be conducted by  (name of individual):  _____

Provider's Address:  _____

Provider's Telephone:  _____  Fax:  _____  E-mail address: _____
☐ No agreement
The ADR process will be conducted on (date):  _____.
☐ No agreement

☐  The parties have reached agreement as to the payment of fees of ADR provider.
☐  The parties have not reached agreement as to the payment of fees of ADR provider.

Type or print name of ☐ Party without attorney ☐ Attorney for   **(Date and Sign)** Attorney or party without
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant              attorney (Sign in blue ink)

Type or print name of ☐ Party without attorney ☐ Attorney for   **(Date and Sign)** Attorney or party without
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant              attorney (Sign in blue ink)

☐  Additional signatures are attached

33

| PLAINTIFF/PETITIONER:  DEFENDANT/RESPONDENT: | CASE NUMBER: |
|---|---|

## ORDER

**A REVIEW HEARING IS SCHEDULED AS FOLLOWS:**

Date            Time

All parties must appear at the Review Hearing. In the event that the case is settled and a dismissal, a notice of settlement or a judgment is filed at least 3 court days before the scheduled Review Hearing, the Review Hearing will be dropped and no one should appear. You must check the phone message at _____ or go to http://www.SonomaSuperiorCourt.com/tentative/index.html where the tentative dispositions will be posted the day before you are scheduled to come to court to determine if you must appear.

***THE FIRST ATTORNEY OR PARTY LISTED MUST FILE PROOF OF SERVICE OF A COPY OF THIS ORDER ON ALL PARTIES.***

Date            JUDGE OF THE SUPERIOR COURT

**34**

07/03/2008 17:33 FAX          MET-LIFE INVESTORS                    Ø029

 

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| (Check one):  ☐ **UNLIMITED CASE**           ☐ **LIMITED CASE** <br> (Amount demanded                    (Amount demanded is $25,000 <br> exceeds $25,000)                     or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:              Dept.:          Div.:          Room:

Address of court *(if different from the address above)*:

INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.

1. **Party or parties** *(answer one)*.
   a. ☐  This statement is submitted by party *(name)*:
   b. ☐  This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.  The complaint was filed on *(date)*:
   b. ☐  The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐  All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐  The following parties named in the complaint or cross-complaint
       (1) ☐  have not been served *(specify names and explain why not)*:
       (2) ☐  have been served but have not appeared and have not been dismissed *(specify names)*:
       (3) ☐  have had a default entered against them *(specify names)*:
   c. ☐  The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a.  Type of case in ☐  complaint    ☐  cross-complaint    *(describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

 

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

10. d.  The party or parties are willing to participate in *(check all that apply):*

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify):*

   e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

   f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

   g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

   ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

   a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

   b. Reservation of rights: ☐ Yes ☐ No

   c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

   Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

   ☐ Bankruptcy ☐ Other *(specify):*

   Status:

**14. Related cases, consolidation, and coordination**

   a. ☐ There are companion, underlying, or related cases.

     (1) Name of case:

     (2) Name of court:

     (3) Case number:

     (4) Status:

     ☐ Additional cases are described in Attachment 14a.

   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

CM-110 [Rev. January 1, 2007]     **CASE MANAGEMENT STATEMENT**     Page 3 of 4

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a. ☐ The trial has been set for *(date)*:
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours *(short causes) (specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*

**CASE MANAGEMENT STATEMENT**

 

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

   | Party | Description | Date |
   |---|---|---|

   c. ☐ The following discovery issues are anticipated (specify):

18. **Economic Litigation**
   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

19. **Other issues**
   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

20. **Meet and confer**
   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain).

   b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

21. **Case management orders**
   Previous case management orders in this case are (check one): ☐ none ☐ attached as Attachment 21.

22. Total number of pages attached (if any). _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____    ▶ _____
(TYPE OR PRINT NAME)                      (SIGNATURE OF PARTY OR ATTORNEY)

_____    ▶ _____
(TYPE OR PRINT NAME)                      (SIGNATURE OF PARTY OR ATTORNEY)
                                    ☐ Additional signatures are attached

CM-110 [Rev. January 1, 2007]          **CASE MANAGEMENT STATEMENT**          Page 4 of 4

38


$1.340
US POSTAGE
FIRST-CLASS
FROM 95492
JUN 02 2008
stamps.com

Richard Johnston
Attorney at Law
131A Stony Circle, Suite 500
Santa Rosa, California 95401

CT Corporation System
818 W 7th St
Los Angeles CA 90017-3407

39

# EXHIBIT B

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company

 Page 1

**Group Affiliation: Metropolitan Life and Affiliated Cos**

# METROPOLITAN LIFE INSURANCE COMPANY

**200 Park Avenue, New York, New York, United States 10166**
**Exec. Office: One MetLife Plaza, Area 7B, Long Island City, New York, United States 11101**
**Web: www.metlife.com**

Tel: 212-579-2211    Fax: 212-578-7298
AMB#: 06704    NAIC#: 65978
FEIN#: 13-5581829

# BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the life/health members of Metropolitan Life and Affiliated Companies, which operate under a group structure, this group member is assigned a Best's Rating of A+ (Superior). The company is assigned the Financial Size Category of Class XV which is the Financial Size Category of the parent.

# RATING RATIONALE

**Rating Rationale:** The rating of Metropolitan Life Insurance Company (MLIC) and its affiliates is based on the organization's very strong positions in its core markets, its well established brand name, diversified operations and continued growth in certain segments. The rating also reflects the overall balance of the organization provided by its core business lines through its property/casualty, international and reinsurance subsidiaries. Through its diversified distribution channels, MetLife maintains the scale necessary to be an industry leader in its various product lines. The group continues to pursue its strategic focus on the life and annuity markets by expanding both its domestic and international market share through organic growth, joint ventures and strategic acquisitions. MLIC manages a balanced investment portfolio which traditionally produces favorable contributions to earnings and capital through realized and unrealized gains. Offsetting these strengths are the declining sales recorded in recent years in its individual life and group annuity lines, its somewhat aggressive capital management evidenced by its moderate risk adjusted capital and leverage positions, its ongoing challenges to reduce its expense infrastructure as well as its increased exposure to the international marketplace.

MetLife has demonstrated strong operating earnings and growth in assets under management on a historical basis. The rating also reflects the group's solid debt service capacity and a demonstrated ability to access the capital markets as a public company. With the regulated entities directly under MetLife, Inc., the group has enhanced its financial flexibility through the upstream dividend capacity of these subsidiaries. Given the scale of its diversified operations, MetLife creates operating efficiencies to optimize returns on each of its business lines. MetLife has taken several steps toward enhancing its financial strength including the recent sale of several high profile properties, strengthening its asset/liability management practices and a reduced asset allocation to the high-yield bond market. Furthermore, the company has centralized its controls around its accounting, financial, operational and reputational risks as it enhances it enterprise risk management program as a means to manage and mitigate risk.

MetLife's rapid growth and expansion through acquisitions has negatively impacted its risk adjusted capital position as measured by A.M. Best. In addition, management has redeployed capital from its core operating subsidiaries to better manage capital in the aggregate and to create operational efficiencies. With additional share repurchases anticipated, and continued dividends from the operating subsidiaries, A.M. Best remains concerned with MetLife's risk adjusted capital position, which remains somewhat low relative to its peers. Furthermore, life and annuity sales results have reflected a downward trend. These trends may be somewhat attributable to the company's prudent underwriting discipline to avoid exposing the company to life policies that may be investor owned. Additionally, the company is expanding its annuity product platform in an effort to generate new sales momentum. After successfully integrating a majority of the Travelers blocks, opportunities remain to create additional operational efficiencies. A.M. Best will continue to monitor challenges associated with the expansion of MetLife's international business platform as the company increases its presence abroad, particularly in the Asian market place.

**Best's Rating: A+ g**    **Outlook: Stable**

40

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

EXHIBIT *B*

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company


## FIVE YEAR RATING HISTORY

| Date | Best's Rating |
|------|---------------|
| 05/29/07 | A+ g |
| 05/05/06 | A+ g |
| 07/01/05 | A+ g |
| 01/31/05 | A+ g |
| 03/31/04 | A+ g |
| 11/19/03 | A+ g |
| 06/23/03 | A+ g |
| 06/21/02 | A+ g |

## KEY FINANCIAL INDICATORS
### (in thousands of dollars)

| Year | Assets | Total Capital Capital Surplus Funds | Condit'l Reserve Funds | Net Premiums Written | Net Invest Income | Net Income |
|------|--------|----------------|----------|----------|----------|----------|
| 2001 | 187,879,380 | 6,046,926 | 3,697,376 | 20,139,308 | 9,115,846 | 2,821,277 |
| 2002 | 203,083,295 | 7,723,149 | 4,772,185 | 22,475,551 | 9,188,381 | 1,490,101 |
| 2003 | 231,272,274 | 8,788,961 | 3,930,063 | 24,969,242 | 8,898,623 | 2,209,953 |
| 2004 | 246,414,492 | 9,667,736 | 4,300,579 | 26,956,591 | 9,464,996 | 2,684,155 |
| 2005 | 251,626,153 | 8,750,417 | 4,051,752 | 26,519,531 | 9,921,547 | 2,188,409 |
| 2006 | 280,557,488 | 9,197,539 | 4,404,179 | 25,627,339 | 10,596,748 | 1,027,211 |
| 09/2006 | 279,832,443 | 10,011,449 | 4,123,200 | 20,349,278 | 7,681,922 | 912,319 |
| 09/2007 | 303,723,711 | 10,515,110 | 4,289,691 | 18,969,017 | 8,572,950 | 1,432,197 |

## BUSINESS REVIEW

CORPORATE OVERVIEW - Metropolitan Life Insurance Company (MLIC), now in its second century of operation, is part of the largest life insurance group in the nation with respect to total life insurance in force and total admitted assets. MLIC, together with its subsidiaries and affiliates, offers a comprehensive portfolio of individual and group life, annuities, pensions, group non-medical health insurance programs, and property and casualty coverage. These products are provided through MetLife's five primary business segments as reported on a GAAP basis: Institutional, Individual, Auto & Home, International and Reinsurance. MLIC operates in all fifty states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Canada. The overall group has also established operations worldwide with direct writing access to over 35 countries. The group strengthened relationships in Brazil, China and Hong Kong and has refined its international strategy by focusing on emerging, high growth markets where it can achieve competitive returns. These international activities are now conducted predominantly outside of the lead insurer's operations.

MetLife's unique organization structure has evolved from mergers, acquisitions and consolidations evidenced by the recent consolidation of Paragon Life Insurance company into MLIC on May 1, 2006. A significant consolidation event occurred with the June 30, 2005 acquisition by MetLife, Inc. of the Travelers Life Insurance Company from Citigroup, adding increased scale in the annuity business and providing access to Citigroup's diverse distribution network. In early 2005, MLIC sold its asset management business, SSRM Holdings, Inc. to a third party ending its activities in the Asset Management segment. In 2004, MetLife, Inc. completed another restack transaction whereby Metropolitan Insurance and Annuity Company and New England Pension and Annuity Company, an indirect subsidiary of MLIC, were merged into Metropolitan Tower Life, a subsidiary of MetLife, Inc. In January 2004, MetLife completed the sale of its operation in Spain, MetLife Iberia, S.A. and its subsidiaries, Seguros Genesis, S.A., and Genesis Seguros Generales, S.A., to Liberty Insurance Group, S.A., a Spanish subsidiary of Liberty Mutual Group. This transaction completed the group's exit from the slow growing insurance marketplace in Spain and Portugal.

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
08704 - Metropolitan Life Insurance Company



Page 3

In April 2000, MLIC converted from a mutual company, owned by its policyholders, to a publicly traded stock company via a full demutualization. The organization simultaneously raised $2.88 billion through an initial public offering of common stock in MetLife, Inc., a holding company created in connection with the reorganization. In addition, approximately $1.006 billion was raised through the issuance of trust preferred securities supported by subordinated debentures issued by MetLife, Inc. and MetLife Capital Trust I. The conversion provided enhanced organizational and financial flexibility associated with public ownership and direct access to the capital markets. MetLife aligns itself into the following business segments:

INSTITUTIONAL BUSINESS:

GROUP LIFE AND NON-MEDICAL HEALTH PRODUCTS - MLIC is the leading provider of group life insurance, non-medical health insurance products, including short and long-term disability, long term care and dental insurance and related administrative services, as well as employer-sponsored auto and homeowners insurance and prepaid legal service plans. Its group insurance products are marketed to small, medium and large companies, either as an integrated employee benefits package or as stand-alone product offerings.

Group life products are the leading products in the group insurance portfolio, where MLIC has been an industry leader for many years in terms of product innovation and customer service. The company over $1.5 trillion in group life insurance in force, which represents an estimated one-fifth share of the U.S. market. The company markets group term, group universal life (GUL) and group variable universal life products (GVUL), accidental death and dismemberment and survivor benefits. MLIC was one of the first companies to offer GUL and GVUL products. Their National Accounts group includes companies with over 25,000 employees and has approximately 11 million covered lives, representing over one-third of the institutional segment revenues. MLIC has achieved organic growth in this area through offering broader coverage and by successfully deepening the relationships and writing additional business from these accounts. In recent years, the company has benefited from sales of some large corporate-owned and bank-owned life insurance (COLI/BOLI) contracts The company has also established a Small Market Strategy to focus activities on the rapidly growing small case group market, with products specifically designed and priced for this segment.

MLIC's group dental operation also has a significant market presence and is a leading provider of traditional and preferred provider dental plans, including voluntary (employee-pay-all) plan designs. The company has consistently expanded its provider network of dentists to its current level of approximately 100,000 dentists, a key competitive factor in the managed dental market. The group dental operation's lead product is its PPO, Preferred Dentist Program (PDP). The PDP is a point-of-service managed dental care plan that allows members access to the dentist of their choice, either in or outside of the MetLife provider network. This program is the largest national commercial dental preferred provider plan with nearly 21 million covered lives. The company has also enhanced their websites, metdental.com for dentists and mybenefits.com for employees.

MLIC provides other primary group non-medical health insurance offerings including long-term care and disability products. Within the past several years MetLife took steps to increase its market share in long-term care, demonstrated by its partnership established with John Hancock, the largest employer-sponsored long-term care program for United States government federal employees and their families. The company is also the largest short-term disability carrier in the industry and the second largest overall disability management provider. The disability business covers more than 3.5 million employees at 10,000 companies worldwide, with a wide range of short and long-term programs including employer-paid, contributory and voluntary programs on an administrative services only or fully insured basis.

RETIREMENT AND SAVINGS PRODUCTS - Retirement and savings products include bundled administrative and investment services sold to sponsors of small and mid-sized 401(k) and other defined contribution plans. MLIC is also a major writer of general account and separate account group annuities. The company offers a variety of stable value products, such as guaranteed interest contracts (GICs) and separate account contracts for the investment of defined benefit and defined contribution assets. The company also offers alternative GICs, in a separate account structure (MetManaged GIC). The MetManaged GIC combines aspects of active asset management with some traditional features of guaranteed interest contracts. MetLife sells retirement income products by leveraging its plan sponsor relationships to respond to the retirement needs of their employees. The Company also issues global GICs to foreign investors.

The acquisition of Travelers has expanded the division's product presence in GICs, Global GICs, Funding Agreements, Payout Annuities and Structured Settlements. General Account assets, attributable to Retirement and Savings, grew approximately 60% as a result of the acquisition.

INDIVIDUAL: The Group serves the middle-income, affluent and business owner markets with protection and asset accumulation products primarily through its agency and independent distribution groups. Products offered include traditional life,

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

42

term, universal and variable life, qualified and non-qualified variable and fixed annuities, disability and long-term care insurance, as well as mutual funds.

The agency distribution groups include the MLIC and New England Financial career and general agency systems. The independent distribution group includes MetLife Investors, General American, Walnut Street Securities and Tower Square Securities. In addition, MetLife Resources offers tax-sheltered annuities to educators, healthcare workers and government employees.

Approximately 8,000 full time agents and advisors sell products through these channels. The company has successfully stabilized its career agent field force through increased focus on training, recruitment and administrative support for its producers. These efforts have generated steadily increasing agent productivity and significantly improved agent retention. The segment is now focused on further improving agent productivity, profitable growth and creating a planning platform for all market segments.

By broadening its distribution of individual life and annuities the company now markets products through independent agents, financial institutions, independent broker/dealers and third party marketing organizations acquired through a series of acquisitions and startups. In 1997, the group purchased Security First Group, Inc. In 2000, MLIC acquired General American Life Insurance Company and in 2001, the group created MetLife Investors. Most recently, MetLife, Inc. acquired Travelers Insurance Company and Travelers Life and Annuity Company. Today, this unit sells products through over 100,000 registered representatives affiliated with other institutions. Currently, independent distribution accounts for more than half of the annuity sales and has grown significantly with the independent distribution relationships acquired through the Travelers transaction. While A.M. Best expects the sales activities in these alternate distribution sources to continue to expand and generate an increasing proportion of overall sales, the company is still strongly committed to supporting and improving its core career agency system. The company has also started to utilize customer data to identify potential customers and aid in the process of lead generation for its field force. A.M. Best believes the success of these initiatives will be important to expand the revenue base and grow earnings in the individual business segment.

INTERNATIONAL: The group focuses on emerging insurance markets in the Asia/Pacific, Latin American and selected European countries and has pursued several acquisitions to expand its global operations. Additional opportunities exist within late-stage, mid-stage and newly-emerging countries, where successful new ventures have been made in countries such as Mexico and Hong Kong. The group currently operates in approximately twelve countries with representative offices in the Czech Republic and China, with relatively new ventures established in India and Chile. The international strategy is to develop existing businesses and those acquired from Citigroup with an objective of establishing a top-five ranking in each country.

In total, the Mexican and Chilean businesses generate a substantial amount of premium volume of its Latin American operations, representing approximately four-fifths of total sales. In November 2001, MetLife, Inc. entered the Chilean market by acquiring two wholly-owned subsidiaries of Santander Central Hispano. In June 2002, MetLife, Inc. completed its acquisition of Aseguradora Hidalgo, S.A. (Hidalgo), Mexico's largest life insurer, for approximately $950 million or 9.2 billion Mexican pesos. MetLife had operated in Mexico for over ten years prior to the Hidalgo acquisition, and has an estimated market share of 25% in the Mexican life market. The group gained valuable size through Hidalgo's group and individual life insurance operations. Hidalgo is the primary provider of group insurance and individual products through worksite marketing to government employees, which is estimated to represent 800,000 of the company's approximately 2.8 million covered lives. Although this contract expired in 2004, the corresponding earnings from this Federal Group Life contract comprise only about one-tenth of this entity's operating earnings.

REINSURANCE: The group's reinsurance operations consist of MetLife, Inc.'s majority ownership of publicly traded life reinsurer Reinsurance Group of America, Incorporated (RGA Inc.) and its wholly-owned life reinsurance subsidiary, RGA Reinsurance Company (RGA). Although the vast majority of RGA's premiums come from the United States, its operations are globally diverse. RGA also provides asset-based reinsurance and financial reinsurance, with a substantial amount of total life reinsurance in-force. MLIC acquired and maintains an approximate 52% ownership of RGA through its acquisition of GenAmerica Financial Corporation in 2006, and the aggregate stake includes the previously purchased 4.8 million common shares through a private placement offering. Following RGA Inc.'s issuance of Preferred Income Redeemable Securities (PIERS) in December 2001, the Company announced its intent to purchase up to $125 million in additional shares in the public company to offset any potential dilution of its holdings caused by RGA Inc.'s future exercise of the PIERS. Currently the reinsurance program consists of individual transactions with companies in the individual life segment.

CLOSED BLOCK: In connection with the company's conversion to a stock company, MLIC established a closed block of business for the benefit of individual participating policyholders, who receive ongoing dividend payments as part of their respective policies. With approval from New York regulators, the Company constructed the closed block and designated sufficient assets that, along with insurance policy premiums, would generate cash flows to support all future benefit and

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

**43**



reasonable dividend payments. These cash flows are expected to be sufficient to pay each policyholder, including the last surviving individual, a commensurate amount of cash flow for policyholder benefits and dividends such that the assets and liabilities run out together over time. These results are reported separately on a GAAP basis. Participating policies represent approximately one-fifth of MLIC's life insurance in-force and approximately three-quarters of the total number of life insurance policies in-force (net of reinsurance). While the company may change its policyholder dividends, A.M. Best expects them to be consistent with the historical trend of prior dividend payments.

In 2000 and 2001, the company entered into various reinsurance arrangements related to its closed block policies with unaffiliated third parties for approximately $32 billion in life insurance reserves under modified coinsurance arrangements. These 10-year contracts effectively ceded 90% of the risk underlying these insurance contracts, with the company retaining approximately 10% of this risk. A.M. Best views favorably the group's control over the investment policy related to these contracts and recognizes the significant amount of risk-based capital relief the company obtains from a regulatory perspective for ceding the underlying asset, insurance, interest rate and reserve risk.

### PREMIUM AND RESERVE ANALYSIS

| Direct Premiums (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Industrial life | 50,000 | 52,129 | 52,725 | 53,082 | 58,426 |
| Ordinary life | 4,698,317 | 4,789,366 | 4,785,386 | 4,838,335 | 4,945,581 |
| Group life | 8,312,682 | 7,174,650 | 6,626,827 | 6,181,135 | 6,496,511 |
| Credit life | 618 | 745 | 797 | 1,156 | 1,572 |
| Individual annuities | 3,698,946 | 3,053,440 | 2,849,745 | 2,861,317 | 2,554,963 |
| Group annuities | 8,460,784 | 9,916,893 | 7,908,331 | 7,258,180 | 7,461,406 |
| Individual A&H | 527,360 | 419,620 | 311,759 | 228,231 | 192,722 |
| Credit A&H | 22 | 29 | 29 | 35 | 39 |
| Group A&H | 3,907,778 | 3,648,466 | 3,239,921 | 2,691,273 | 2,555,525 |
| Other | 54 | -6 | -5 | ... | ... |
| Total | 29,656,561 | 29,055,331 | 25,775,515 | 24,112,744 | 24,266,744 |

| Reins Assumed Prems (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 16,426 | 8,291 | 29,838 | 38,076 | 37,595 |
| Group life | 490,534 | 460,162 | 395,804 | 360,484 | 273,970 |
| Credit life | ... | ... | 7,040 | 9,064 | 11,191 |
| Individual annuities | 575,037 | 439,765 | 5,201,499 | 5,045,225 | 2,580,660 |
| Group annuities | 179 | 255 | 1,077 | 377 | 0 |
| Individual A&H | 127,071 | 131,073 | 111,835 | 74,763 | 81,787 |
| Credit A&H | ... | 2,527 | 9,985 | 12,459 | 16,278 |
| Group A&H | 5,562 | 6,817 | 7,137 | 8,626 | 21,698 |
| Other | ... | ... | 98,718 | 52,938 | 166,775 |
| Total | 1,214,808 | 1,048,889 | 5,862,934 | 5,602,012 | 3,189,953 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

| Reins Ceded Prems (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 833,616 | 677,349 | 674,767 | 569,315 | 527,040 |
| Group life | 1,079,070 | 1,021,271 | 1,049,666 | 1,071,402 | 1,081,915 |
| Credit life | 618 | 1,362 | ... | ... | ... |
| Individual annuities | 23,477 | 13,640 | 5,704 | 851 | 1,103 |
| Group annuities | 1,466,625 | 459 | 487 | 825 | 1,060 |
| Individual A&H | 73,367 | 75,759 | 79,235 | 80,636 | 87,510 |
| Credit A&H | 22 | 49 | ... | ... | ... |
| Group A&H | 47,531 | 60,534 | 73,296 | 65,479 | 69,806 |
| Other | 1,719,703 | 1,734,266 | 2,798,702 | 2,957,005 | 3,212,712 |
| Total | 5,244,029 | 3,584,689 | 4,681,857 | 4,745,513 | 4,981,146 |

| Net Premiums & Deposits (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Industrial life | 50,000 | 52,129 | 52,725 | 53,082 | 58,426 |
| Ordinary life | 3,904,664 | 4,148,457 | 4,171,138 | 4,342,107 | 4,494,677 |
| Group life | 7,724,146 | 6,613,540 | 5,972,965 | 5,470,217 | 5,688,566 |
| Credit life | ... | -617 | 7,837 | 10,220 | 12,763 |
| Individual annuities | 10,483,021 | 9,437,283 | 13,590,853 | 13,156,502 | 10,093,359 |
| Group annuities | 15,210,316 | 14,379,461 | 12,896,591 | 12,615,046 | 10,238,334 |
| Individual A&H | 581,064 | 474,933 | 344,358 | 222,357 | 186,998 |
| Credit A&H | ... | 2,506 | 10,014 | 12,494 | 16,317 |
| Group A&H | 3,865,808 | 3,594,748 | 3,173,762 | 2,634,421 | 2,507,416 |
| Other | -1,719,649 | -1,734,272 | -2,699,989 | -2,904,067 | -3,045,937 |
| Total | 40,099,369 | 36,968,170 | 37,520,255 | 35,612,378 | 30,250,919 |
| Deposits (incl. above) | 14,472,030 | 10,448,639 | 10,563,664 | 10,643,135 | 7,775,368 |

| General Account Reserve Distribution (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Industrial life | 2,141,656 | 2,299,211 | 2,350,585 | 2,400,309 | 2,444,691 |
| Ordinary life | 45,263,846 | 44,935,061 | 43,772,965 | 43,296,665 | 42,390,371 |
| Group life | 5,530,782 | 5,788,633 | 5,601,177 | 5,448,735 | 5,285,471 |
| Credit life | ... | ... | 31 | 51 | 88 |
| Supplementary contracts | 843,040 | 802,653 | 769,104 | 737,562 | 739,936 |
| Individual annuities | 18,410,471 | 18,650,230 | 18,610,073 | 17,407,788 | 16,183,898 |
| Group annuities | 34,803,523 | 35,857,958 | 34,237,855 | 32,805,782 | 32,070,023 |
| Deposit type contracts | 35,828,404 | 28,097,352 | 24,673,763 | 20,102,195 | 14,591,548 |
| Individual A&H | 2,467,987 | 1,842,609 | 1,423,628 | 1,019,342 | 962,696 |
| Credit A&H | ... | ... | 32 | 37 | 28 |
| Group A&H | 4,731,461 | 4,289,222 | 3,786,893 | 3,536,888 | 3,227,929 |
| Total | 150,021,170 | 142,562,929 | 135,226,105 | 126,755,355 | 117,896,680 |

**Current Year Geographic Direct Premium Distribution ($000):** New York, $8,801,092 (23.2%); California, $2,913,585 (7.7%); New Jersey, $2,443,782 (6.4%); Texas, $1,746,776 (4.6%); Illinois, $1,591,877 (4.2%); other jurisdictions, $20,469,762 (53.9%).

# EARNINGS

MLIC's statutory earnings have generally improved on a historical basis, with particular improvement seen in the recent years as

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company

Page 7

a result of strengthening in its group annuities business. The operating fundamentals of the company's core businesses have improved over the past five years as additional costs have been removed from its higher-than-average expense infrastructure, providing a strong platform for future profitable growth. The company has implemented a series of initiatives in its Individual business segment (individual life and annuities) that have generated productivity enhancements, and vastly improved agent retention. The company has also strategically expanded its presence in the institutional pension arena, through organic growth and strategic acquisitions, both domestically and internationally. As a result of these efforts, the company's reported premium income and operating earnings have generally increased along with consistent positive trends in its asset base, with somewhat unfavorable trends in its separate account asset in recent years due to the volatile equity market conditions and low interest rates that hampered fixed annuity sales.

Historical statutory results by line of business have fluctuated due to a number of factors, including: interest rate volatility; costs and proceeds associated with the sale of various non-core operations; adverse claims experience in its disability business; the impact of low interest rates, costs, including severance, associated with restructuring certain operations and on its interest sensitive and guaranteed interest contract (GIC) businesses. Despite the frequency and size of these single-event items, the company has experienced overall improvements in its statutory results due to improved operating fundamentals, particularly with respect to its individual life line of business. The group has produced favorable results overall, offset somewhat by its individual and group annuity segments which have exhibited some volatility in sales and performance. The company has also benefited from strong and consistent group life results that reflect favorable mortality experience, strong sales of group term and group variable/universal life product, as well as very strong persistency on existing business. Overall, group life operations have generated between one-quarter and two-thirds of the company's total pre-tax statutory net operating gain over the past five years.

On a GAAP basis, MetLife recorded a $3 billion net gain, from the sale of its Peter Cooper Village - Stuyvesant Town apartment complex in New York City. The Group's operating performance in recent years measured in terms of overall profitability, return on assets and return on equity, has also improved steadily. While consolidated operating earnings have improved significantly in recent years, the group's net income has been somewhat volatile. This is partly due to one-time costs associated with exiting of certain businesses, restructuring initiatives and regulatory settlements including sales and market timing issues. Additionally, MetLife, Inc. took a $325 million pre-tax charge in 2001 ($208 million after tax) related to potential claims arising from the September 11 terrorist attacks. In recent years the group instituted a more disciplined approach to pricing new sales and renewals of its disability products, resulting in improved profitability from 2002 forward offsetting some declines recognized in the late 1990's to early 2000's.

The company has recorded results in line with current equity market performance. Improving results in its international operations is driven by its broad market presence and its ability to strategically establish joint ventures in emerging markets. The continued success of its restructuring initiatives in the career agency system and renewed revenue growth in its Institutional lines have proven to be critical to the company's ability to close the expense gaps associated with its relatively high fixed cost structure, and have strengthened its earning capacity on both a statutory and GAAP basis. Overall, A.M. Best believes the Group's results should continue to show improvements in profitability given the initiatives completed and those underway, in order to achieve the levels of productivity necessary to place the company among the most efficient life insurers. MetLife, Inc. is well-positioned to compete effectively against other insurance focused financial services companies, and expects to see ongoing growth and performance improvements.

## PROFITABILITY TESTS

| Year | Ben Paid to NPW & Dep | Comm & Exp to NPW & Dep | NOG to Tot Assets | NOG to Tot Rev | Operating Return on Equity | Net Yield | Total Return |
|---|---|---|---|---|---|---|---|
| 2002 | 69.9 | 8.5 | 1.0 | 6.2 | 28.8 | 6.70 | 6.15 |
| 2003 | 58.9 | 8.6 | 0.7 | 4.5 | 18.6 | 5.76 | 6.33 |
| 2004 | 59.2 | 9.0 | 1.1 | 7.0 | 27.8 | 5.61 | 5.90 |
| 2005 | 66.2 | 8.8 | 0.6 | 3.9 | 14.9 | 5.68 | 6.42 |
| 2006 | 68.4 | 8.8 | 0.5 | 3.7 | 14.4 | 5.71 | 5.77 |
| | | | | | | | |
| 09/2006 | 102.8 | 12.8 | 0.4 | 3.5 | 10.1 | 4.09 | 4.19 |
| 09/2007 | 109.6 | 14.1 | 0.5 | 5.2 | 14.3 | 4.19 | 4.36 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

**46**

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company  Page 8

## PROFITABILITY ANALYSIS

| Net Operating Gain (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Industrial life | 22,837 | 22,976 | 16,818 | 21,005 | 25,466 |
| Ordinary life | -160,567 | -241,269 | 130,611 | 94,721 | 232,890 |
| Group life | 130,971 | 171,838 | 236,108 | 186,861 | 165,488 |
| Credit life | 734 | 9,020 | 3,685 | 5,251 | 4,139 |
| Supplementary contracts | 163,016 | 163,244 | 127,714 | 124,442 | 83,871 |
| Individual annuities | 84,091 | 40,357 | 542,987 | -4,813 | 25,258 |
| Group annuities | 445,198 | 470,464 | 602,984 | 391,613 | 486,666 |
| Individual A&H | -300,276 | -63,135 | -21,772 | -3,438 | 12,311 |
| Credit A&H | ... | 2,506 | 5,957 | 3,995 | 8,566 |
| Group A&H | 192,888 | 130,667 | 176,600 | 145,279 | 157,254 |
| Other | 717,582 | 668,938 | 743,122 | 567,358 | 783,130 |
| Total | 1,296,474 | 1,375,605 | 2,564,814 | 1,532,275 | 1,985,039 |

## ACCIDENT & HEALTH STATISTICS

| Year | Net Premiums Written | Net Premiums Earned | Loss Ratio | Exp. Ratio | Under-writing Results |
|---|---|---|---|---|---|
| 2002 | 2,706,798 | 2,705,352 | 84.3 | 21.7 | -142,530 |
| 2003 | 2,886,468 | 2,868,261 | 87.2 | 22.0 | -112,716 |
| 2004 | 3,571,629 | 3,515,335 | 84.1 | 23.8 | -166,261 |
| 2005 | 4,113,015 | 4,081,319 | 78.0 | 21.7 | -341,471 |
| 2006 | 4,548,253 | 4,442,386 | 91.9 | 20.6 | -605,719 |
| **Current Year Experience:** | | | | | |
| Group | 3,864,567 | 3,865,537 | 81.6 | 17.0 | 24,536 |
| Collectively renew | 5 | 5 | 143.5 | 37.4 | -4 |
| Non-can | 188,272 | 185,188 | 84.8 | 48.0 | -62,692 |
| Guaranteed renew | 491,767 | 388,263 | 198.1 | 38.0 | -567,654 |
| Non-renew, S.R. | 3,045 | 2,801 | 29.5 | 62.5 | 71 |
| Other accident | 11 | 11 | 69.6 | 37.4 | -1 |
| Other | 585 | 581 | 91.7 | 4.2 | 24 |

## CAPITALIZATION

MetLife has demonstrated its ability to maintain moderate amounts of financial leverage and good financial flexibility that compare favorably to its similarly rated peers. During the Traveler's acquisition in 2005, MetLife increased its financial leverage to roughly 30% -- attributing some equity credit for hybrid securities; however, the company was able to moderate its leverage back to roughly 26% in 2007.

In 2007, MetLife implemented a $1 billion share repurchase program to re-deploy capital acquired from the sale of its Peter Cooper Village - Stuyvesant Town property. In recent years, MLIC increased its capital and surplus by limiting dividends to the holding company, issuing capital notes and selling certain higher-risk assets including real estate. These efforts follow the company's aggressive management of its capital in recent years, which resulted in weakened risk adjusted-capitalization caused by approximately $721 million in ordinary dividends paid to the parent, along with approximately $3.1 billion in additional extraordinary dividends, which received approval for payment from New York regulators. MetLife was permitted to pay these dividends after completing intercompany sales of certain undervalued real estate properties at fair market value to Metropolitan Insurance and Annuity Company, a former subsidiary of MetLife. Based upon these dividends, capital and surplus fell by over $2

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

47



billion.

MetLife continues to refine its organizational structure by implementing restacking initiatives to increase the financial flexibility of several of its insurance entities, enhance their upstream dividend capacity to the parent holding company, eliminate non-core, redundant entities and generate a moderate level of statutory gains. For example, recent consolidations have included Citicorp Life, First Citicorp Life and Paragon Life merging into MLIC and MetLife Investors Insurance Company of CA merged into MetLife Investors Insurance Company. In recent years, Security Equity Life Insurance Company and MetLife Security Insurance Company of Louisiana merged into the parent MetLife, Inc. While A.M. Best considers the risk-adjusted capital position of the MetLife group, inclusive of all life insurance entities on a consolidated basis, to measure commensurately with other superior rated companies, attention is also placed on the appropriate level of risk-adjusted capital in each individual subsidiary. However, the collective actions taken by management reinforce MetLife's diverse and substantial financial resources, with a significant amount of available funds remaining at the parent company and within the MetLife organization, albeit outside the insurance company's control.

As a mutual company, MetLife added to its capital base through the issuance of surplus notes with $700 million issued in 1993 and another $700 million in 1995. Currently, MetLife has approximately $699 million in total surplus notes, following the call and redemption of $700 million in surplus notes in 2003. The remaining outstanding notes also include $148 million issued by New England Life Insurance Co. and $100 million issued by General American Life (GenAm), both of which were assumed by MetLife at the time of their respective company acquisitions. MetLife financed the acquisition of GenAm, as well as the stabilization program to provide liquidity to satisfy GenAm's institutional funding agreement contracts, mainly through the issuance of commercial paper. A.M. Best notes that MetLife currently retains capacity under MetLife Funding's commercial paper program, strong liquidity within its invested asset portfolio, multiple sources of external financing availability and additional liquidity through MetLife's committed credit facilities, providing adequate capacity to satisfy the ongoing liquidity needs of the enterprise.

## LEVERAGE TESTS

| Year | C&S to Liabilities | Surplus Relief | Reins Leverage | NPW & Dep to Capital | Change in NPW & Dep | Change in Capital |
|------|------|------|------|------|------|------|
| 2002 | 7.5 | 6.9 | 44.5 | 2.4 | 11.4 | 28.2 |
| 2003 | 6.8 | 4.9 | 39.4 | 2.8 | 17.7 | 1.8 |
| 2004 | 7.3 | 5.4 | 35.9 | 2.7 | 5.4 | 9.8 |
| 2005 | 6.6 | 4.9 | 50.7 | 2.9 | -1.5 | -8.3 |
| 2006 | 6.3 | 4.5 | 71.1 | 2.9 | 8.5 | 6.2 |
| | | | | | | |
| 09/2006 | 6.6 | 2.7 | XX | 1.4 | 7.6 | 10.4 |
| 09/2007 | 6.5 | 2.8 | XX | 1.3 | -6.8 | 8.8 |

2006 BCAR: 127

## SOURCES OF CAPITAL GROWTH
### (in thousands of dollars)

48

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly



| Year | Net Gain | Realized Capital Gains | Unrealized Capital Gains | Change AVR | Other Changes | Change in C&S |
|------|----------|------------------------|--------------------------|------------|---------------|---------------|
| 2002 | 1,985,039 | -494,938 | -271,427 | 547,754 | -90,205 | 1,676,223 |
| 2003 | 1,532,275 | 677,678 | 223,810 | 634,664 | -2,002,615 | 1,065,812 |
| 2004 | 2,564,814 | 119,341 | 308,500 | -528,117 | -1,585,763 | 878,775 |
| 2005 | 1,375,605 | 812,805 | 501,605 | 231,325 | -3,838,657 | -917,319 |
| 2006 | 1,296,474 | -269,263 | 393,246 | -428,664 | -544,671 | 447,121 |
| 09/2006 | 945,871 | -33,552 | 242,090 | XX | XX | XX |
| 09/2007 | 1,414,264 | 17,932 | 346,117 | XX | XX | XX |

## CAPITAL TRENDS
### (in thousands of dollars)

| Year | Year end C&S | Surplus Notes | Stock-holder Divs | Policy-holder Divs | Asset Valuation Reserve | Interest Maintenance Reserve |
|------|--------------|---------------|-------------------|--------------------|-------------------------|------------------------------|
| 2002 | 7,723,149 | 1,547,704 | 903,900 | 208,550 | 3,149,622 | 733,720 |
| 2003 | 8,788,961 | 847,830 | 1,448,100 | 296,111 | 2,514,958 | 793,229 |
| 2004 | 9,667,736 | 847,830 | 797,000 | 265,433 | 3,043,075 | 845,652 |
| 2005 | 8,750,417 | 1,397,830 | 4,031,760 | 179,987 | 2,811,750 | 572,864 |
| 2006 | 9,197,539 | 1,397,830 | 863,000 | 182,982 | 3,240,414 | 278,582 |
| 09/2006 | 10,011,449 | XX | ... | 161,501 | 2,994,056 | 320,531 |
| 09/2007 | 10,515,110 | XX | 500,000 | 171,311 | 3,263,975 | 226,863 |

# INVESTMENTS AND LIQUIDITY

Given the size as the largest insurance group in the U.S., MLIC's admitted assets are well-diversified and its overall liquidity position is strong. In addition to maintaining quality, diversification and optimizing risk adjusted investment income and risk adjusted total return, the Group's investment philosophy requires that a reasonable match exists between the option adjusted characteristics of its assets and the cash flow needs of its insurance and investment products. Historically, bonds and mortgage loans have comprised approximately four-fifths of consolidated invested assets, with real estate, policy loans, equity holdings, cash and short-term investments and other assets, including limited partnership interests, comprising the remaining classes. In recent years, the company had shifted more assets from its real estate holdings, common stock and policy loans into bonds, mortgage loans and cash and short-term investments. Fixed-income investments are diversified among publicly traded and privately placed corporate bonds, U.S. Government and municipals, foreign bonds, commercial and residential mortgage-backed securities (MBS) and asset-backed securities (ABS). The company is a significant participant in the private placement bond market, which increased as a percentage of MLIC's portfolio and represents approximately one-fifth of its bond investments. A.M. Best believes these are appropriate investments due to the relatively stable individual life insurance liabilities and the scale of its investment operations. Both the public and private corporate portfolios are highly diversified by economic sector and issuer, with investments typically spread among the industrial, utility and financial sectors. The company has maintained a high quality bond portfolio with over 90% rated investment grade. MetLife has reversed the buildup in high yield corporate securities as the risk adjusted total return no longer seemed attractive.

MetLife maintains a diversified portfolio of mortgage and equity investments. Mortgage holdings are well diversified by asset type with exposure to both commercial and agricultural loans. Commercial and agricultural loans are distributed geographically and by type of end-use with commercial mortgage exposure to loans made on office, retail, industrial and apartment properties. The company's diverse mortgage holdings generate substantial cash flows, and the portfolio is conservatively managed. MetLife's portfolio diversification in real estate equity and commercial mortgage and agricultural loans was a source of portfolio strength during the recent credit cycle downturn.

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly



Like many of its competitors, MetLife maintains a manageable exposure to mortgage backed securities (MBS) which, despite their relatively high credit quality, can present a higher degree of interest rate risk and cash flow volatility. Historically, MBS's have represented approximately one-fifth of the company's consolidated fixed maturities. A majority of the company's MBS portfolio is collateralized mortgage obligations (CMOs), which generally have more stable cash flows. MetLife's conservative asset/liability management practices match MBS with liabilities that have similar durations as well as interest rate and cash flow risks.

MetLife historically maintained an above-average exposure to real estate related investments, although this exposure has been significantly reduced in recent years on an absolute basis and as a percentage of capital and surplus. As part of the company's plan to gradually reduce its exposure to equity real estate, sales on a number of properties, have generated solid gains, reflecting the generally favorable real estate market conditions. Further, in 2001 the company completed an intercompany sale of two undervalued real estate properties between MLIC and Metropolitan Insurance and Annuity Company (MIAC), which resulted in approximately $1.5 billion in realized capital gains for MetLife and gains on common stock of affiliates totaling $800 million. On a GAAP basis, these transactions were eliminated upon consolidation. The company also sold selected real estate properties in 2002 and reaped material capital gains from these undervalued assets, further evidence of the company's deep financial flexibility. MetLife's recent strategy has been to sell its high profile properties reaping gains while improving their risk management and to invest in smaller commercial and residential properties, which increases portfolio diversification and allows greater diversification, thereby creating higher returns. It subsequently sold 11 Madison Avenue, California Plaza and other select properties for a material net gain. Additionally, in 2004, the company sold the Sears Tower in Chicago, which delivered an after tax gain of approximately $90 million. In 2005, as part of the Travelers acquisition funding plan, and reflecting the strong NYC market, the company sold 200 Park Avenue and One Madison Avenue, its former iconic headquarters realizing after tax capital gains of $750 million and $420 million respectively. In 2006, it sold its Peter Cooper Village-Stuyvesant Town property held by Met Tower Life Insurance Company for $5.4 billion which provided a net gain of roughly $3 billion.

Derivatives contracts, such as futures, swaps, caps, floors and options, are utilized to hedge or reduce risks associated with its invested assets, liabilities, portfolios of assets or liabilities or anticipated transactions. In addition, the company enters into replication derivative transactions. Given the strong asset/liability management practices of the company, A.M. Best believes that the company appropriately manages its exposure in this area. MLIC's notional amount of derivatives contracts outstanding is modest relative to its asset base.

MLIC has demonstrated its ability to generate strong investment income and yields from its asset portfolio. The investment yield has been somewhat tempered by the lower interest rate environment impacting the yield of new and reinvested cash. With an improving economic climate, realized investment losses significantly declined. The company's unrealized loss position decreased during the same time period and the current balance represents primarily market driven losses rather than credit or economic losses. The anticipation of higher rates has led MetLife to reposition its various bond portfolios generating somewhat higher levels of realized losses that are anticipated to be offset by redeployment at higher rates. A.M. Best notes the Group's ability to generate significant and consistent investment returns in spite of fluctuating market conditions reflects favorably on the company's investment management expertise and quality and depth of its portfolio.

## LIQUIDITY TESTS

| Year | Operating Cash Flow ($000) | Quick Liquidity | Current Liquidity | Non-Inv Grade Bonds to Capital | Delnq & Foreclsd Mtg to Capital | Mtg & Cred Ten Lns & RE to Cap | Affil Invest to Capital |
|------|------|------|------|------|------|------|------|
| 2002 | 17,337,254 | 44.0 | 53.1 | 87.3 | 0.2 | 233.1 | 76.0 |
| 2003 | 17,187,487 | 45.4 | 54.6 | 81.3 | 0.3 | 231.4 | 117.8 |
| 2004 | 7,850,679 | 44.2 | 55.5 | 65.0 | 0.2 | 238.5 | 118.5 |
| 2005 | 691,213 | 41.6 | 50.8 | 74.3 | 0.2 | 273.8 | 109.6 |
| 2006 | 18,428,926 | 39.8 | 50.0 | 82.0 | 0.3 | 278.7 | 109.9 |
| | | | | | | | |
| 09/2006 | 20,973,528 | XX | XX | 75.9 | 0.5 | 263.7 | XX |
| 09/2007 | 11,718,698 | XX | XX | 82.5 | 0.1 | 267.8 | XX |

## INVESTMENT YIELDS

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

**50**

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company 

| Year | Net Yield | Bonds | Stocks | Mort-gages | Cash & Short Term | Real Estate Gross | Net | Invest. Exp. Ratio |
|------|-----------|-------|--------|------------|-------------------|-------------------|-----|--------------------|
| 2002 | 6.70 | 7.05 | 4.32 | 7.62 | 4.43 | 20.84 | 9.47 | 11.28 |
| 2003 | 5.76 | 5.89 | 1.33 | 7.38 | 3.54 | 18.50 | 9.03 | 10.59 |
| 2004 | 5.61 | 5.57 | 2.11 | 7.16 | 1.91 | 17.41 | 8.21 | 9.43 |
| 2005 | 5.68 | 5.89 | 3.42 | 6.99 | 4.39 | 16.08 | 7.83 | 12.65 |
| 2006 | 5.71 | 6.32 | 1.34 | 6.71 | 10.73 | 14.29 | 6.36 | 17.55 |

## INVESTMENT DATA

Current Year Distribution of Bonds By Maturity

| | 0-1 | 1-5 | 5-10 | 10-20 | 20- | Yrs-Avg Maturity |
|---|-----|-----|------|-------|-----|------------------|
| Government | 0.6 | 2.4 | 2.6 | 1.1 | 4.3 | 14 |
| Gov't Agencies & Muni | 1.6 | 3.7 | 3.4 | 5.7 | 7.9 | 14 |
| Public Utilities | 0.3 | 1.0 | 0.9 | 0.8 | 1.9 | 14 |
| Industrial & Misc | 5.4 | 19.4 | 18.9 | 5.5 | 6.3 | 8 |
| Affiliated | 0.1 | 0.0 | ... | ... | 6.3 | 25 |
| Total | 7.9 | 26.5 | 25.8 | 13.0 | 26.8 | 11 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|------|------|------|------|------|
| Bonds (000) | 135,002,701 | 124,686,315 | 127,203,861 | 122,566,920 | 105,311,901 |
| US Government | 8.8 | 10.7 | 8.0 | 9.0 | 14.1 |
| Foreign Government | 0.2 | 1.8 | 1.8 | 1.9 | 2.2 |
| Foreign - All Other | 10.3 | 10.7 | 10.3 | 8.8 | 9.8 |
| State/Special Revenue - US | 22.8 | 20.0 | 19.3 | 21.9 | 16.8 |
| Public Utilities - US | 4.5 | 5.1 | 5.4 | 5.7 | 4.2 |
| Industrial & Misc - US | 47.0 | 44.7 | 46.9 | 45.6 | 48.1 |
| Credit Tenant Lns - US | ... | ... | 0.3 | 0.4 | 0.5 |
| Affiliated | 6.5 | 6.9 | 7.9 | 6.6 | 4.3 |
| | | | | | |
| Private Issues | 16.8 | 15.3 | 19.4 | 14.1 | 16.0 |
| Public Issues | 83.2 | 84.7 | 80.6 | 85.9 | 84.0 |

| Bond Quality (%) | 2006 | 2005 | 2004 | 2003 | 2002 |
|------------------|------|------|------|------|------|
| Class 1 | 72.6 | 72.2 | 70.0 | 68.6 | 66.1 |
| Class 2 | 19.3 | 20.3 | 22.9 | 23.1 | 23.8 |
| Class 3 | 4.4 | 4.4 | 4.4 | 4.8 | 6.4 |
| Class 4 | 3.4 | 2.9 | 2.4 | 2.9 | 3.0 |
| Class 5 | 0.4 | 0.2 | 0.3 | 0.4 | 0.6 |
| Class 6 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|------|------|------|------|------|
| Mortgages (000) | 34,324,987 | 31,380,717 | 29,623,663 | 25,729,723 | 24,619,496 |
| Commercial | 78.3 | 80.2 | 81.1 | 80.0 | 79.6 |
| Residential | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Farm | 21.7 | 19.8 | 18.9 | 20.0 | 20.4 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company                                                   Page 13



| Mortgage Quality (%) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| 90 Days Delinquent | 0.0 | 0.1 | 0.0 | 0.1 | 0.0 |
| In Process of Foreclosure | 0.1 | 0.0 | 0.1 | 0.0 | 0.0 |
| Total Delinquencies | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Real Estate (000) | 3,586,248 | 3,665,994 | 3,315,114 | 3,245,193 | 3,999,616 |
| Property Occupied by Co | 8.7 | 7.5 | 6.5 | 7.0 | 6.6 |
| Property Held for Inc | 91.3 | 92.5 | 86.9 | 90.2 | 88.0 |
| Property Held for Sale | ... | 0.0 | 6.6 | 2.8 | 5.4 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Stocks (000) | 9,747,144 | 4,162,033 | 4,698,803 | 5,149,619 | 5,324,911 |
| Unaffiliated Common | 17.0 | 40.3 | 29.3 | 15.1 | 16.2 |
| Affiliated Common | 8.0 | 9.6 | 18.8 | 34.5 | 56.1 |
| Unaffiliated Preferred | 53.7 | 5.7 | 8.3 | 13.5 | 14.8 |
| Affiliated Preferred | 21.4 | 44.3 | 43.7 | 36.9 | 12.9 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Other Inv Assets (000) | 17,700,370 | 14,815,410 | 13,915,191 | 12,839,802 | 10,254,580 |
| Cash | 4.0 | 7.2 | 10.4 | 11.0 | 1.9 |
| Short-Term | 3.5 | 3.4 | 6.6 | 15.4 | 17.8 |
| Schedule BA Assets | 52.4 | 45.5 | 39.8 | 26.2 | 26.8 |
| All Other | 40.1 | 43.8 | 43.2 | 47.4 | 53.5 |

## HISTORY

**Date Incorporated:** 03/24/1868              **Date Commenced:** 03/25/1868
**Domicile:** NY

The Group periodically re-stacks its organization to promote operating efficiencies, financial flexibility and improve dividend capacity through its entities. In 2002, MetLife, Inc.'s restacking plan resulted in the following intercompany transactions: MetLife, Inc. contributed MetLife Iberia, its Spanish subsidiary, to MetLife International Holdings, Inc. (MIH); MetLife, Inc. acquired Security Equity Life Insurance Company (Security Equity) and Cova Corporation (Cova) from General American Life Insurance Company (GenAm); MLIC contributed its subsidiary, Texas Life Insurance Company, to Cova; and MetLife sold MIH, Cova, MetLife Investors Group, Inc. and various foreign subsidiaries to MetLife, Inc., the parent holding company. GenAm also sold Missouri Reinsurance (Barbados), Inc. to MetLife and Walnut Street Securities to MetLife, Inc. In that same year, MetLife Group, Inc., a new subsidiary of MetLife, Inc., was created as an employee services company that supports all of the enterprise's personnel needs. In October 2003, MetLife, Inc. completed another re-stacking transaction to increase capital efficiency and flexibility between the parent MetLife, Inc., and its subsidiaries. This restacking plan resulted in the following intercompany transactions: MLIC sold Metropolitan Property and Casualty Insurance Company, Metropolitan Tower Life Insurance Company and two non-insurance subsidiaries to MetLife, Inc., the parent holding company. In addition, Security Equity Life Insurance Company and MetLife Security Insurance Company of LA were merged into the parent MetLife, Inc. In January 2007, MetLife Investors (CA) was merged into MetLife Investors Insurance Company.

**Mergers:** Paragon Life Insurance Company, Missouri, 2006; Citicorp Life Insurance Company, Arizona, 2006; First Citicorp Life Insurance Company, New York, 2006.

## OFFICERS

Chairman of the Board, President and Chief Executive Officer, C. Robert Henrikson; Presidents, William J. Mullaney (Institutional), William J. Toppeta (International), Lisa M. Weber (Individual Business and Auto & Home), Senior Executive Vice President and Chief Administrative Officer, Catherine A. Rein; Executive Vice President and Chief Financial Officer,

Copyright © 2007, A.M. Best Company. All Rights Reserved
Reproduction and distribution of A.M. Best data to third parties is strictly

**52**

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company        Page 14

William J. Wheeler; Executive Vice President and Chief Investment Officer, Steven A. Kandarian; Executive Vice President and Chief Accounting Officer, Joseph J. Prochaska, Jr.; Executive Vice President and General Counsel, James L. Lipscomb; Senior Vice President and Secretary, Gwenn L. Carr, Senior Vice President and Treasurer, Eric T. Steigerwalt; Vice President and Actuary, Patrick D. Studley.

## DIRECTORS

Burton A. Dole, Jr., Cheryl W. Grise, C. Robert Henrikson, James R. Houghton, R. Glenn Hubbard, Helene L. Kaplan, John M. Keane, James M. Kilts, Charles M. Leighton, Sylvia M. Mathews-Burwell, Hugh B. Price, David Satcher, Kenton J. Sicchitano, William C. Steere, Jr.

## REINSURANCE

The company reinsures up to 90% of the mortality risk of certain blocks of life insurance. For more recent individual life blocks, the company reinsures certain corridors of mortality risk in excess of $1 million per life. The company's maximum net retention on any one life is $25,000,000. In addition to reinsuring mortality risk, the company reinsures other risks and specific coverages.

The company cedes reinsurance to a diversified array of affiliated and nonaffiliated reinsurers. Placement of reinsurance is done primarily on an automatic basis and also on a facultative basis for risks of specific characteristics. Reinsurance is primarily on a coinsurance, yearly renewable term, and modified coinsurance basis. The company also assumes a significant amount of insurance from affiliates as well as a few blocks from non-affiliates.

## REGULATORY

An examination of the financial condition is being made as of December 31, 2003 by the Insurance Department of New York. The 2006 annual independent audit of the company was conducted by Deloitte & Touche, LLP. The annual statement of actuarial opinion is provided by Patrick D. Studley, Vice President and Senior Actuary.

**Territory:** The company is licensed in the District of Columbia, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands and all states. It is also licensed in all Canadian provinces and territories. It is also permitted to solicit life insurance among certain military personnel and their dependents and certain other United States and Canadian citizens overseas.

**Reserve basis:** (Current ordinary business): 1980 CSO 3% to 5.0% for policies which are valued on either the Net Level Premium Plan, CRVM or GCV valuation. (Current group annuity business): GAR94 and 1983 GAM 4.75% to 6.25%; CARVM. (Current individual annuity business): Annuity 2000 and 1983 Table a 4.75% to 6.25%; CARVM.

## FINANCIAL INFORMATION

### BALANCE SHEET - December 31, 2006
### (in thousands of dollars)

**53**

Copyright © 2007, A.M. Best Company. All Rights Reserved
Reproduction and distribution of A.M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company

Page 15

| Assets | | Liabilities | |
|---|---|---|---|
| *Total bonds | 135,002,701 | +Net policy reserves | 114,192,766 |
| *Total preferred stocks | 7,313,699 | Policy claims | 2,399,422 |
| *Total common stocks | 2,433,445 | Deposit type contracts | 35,828,404 |
| Mortgage loans | 34,324,987 | Interest maint reserve | 278,582 |
| Real estate | 3,586,248 | Comm taxes expenses | 2,027,314 |
| Contract loans | 5,566,345 | Asset val reserve | 3,240,414 |
| Cash & short-term inv | 1,327,408 | Contingency reserve | 1,163,765 |
| Other invested assets | 9,266,435 | Other liabilities | 40,696,481 |
| Prems and consids due | 1,506,792 | | |
| Accrued invest income | 1,940,953 | Tot liab w/o sep accts | 199,827,149 |
| Other assets | 6,713,896 | Separate account bus | 71,532,801 |
| | | Total Liabilities | 271,359,949 |
| Tot assets w/o sep accts | 208,982,908 | Common stock | 4,945 |
| Separate account bus | 71,574,580 | Surplus notes | 1,397,830 |
| | | Paid in & contrib surpl | 5,785,924 |
| | | Special surplus funds | 353,079 |
| | | Unassigned surplus | 1,655,760 |
| Assets | 280,557,488 | Total | 280,557,488 |

*Securities are reported on the bases prescribed by the National Association of Insurance Commissioners. + Analysis of reserves; Life $50,065,287; annuities $53,196,347; supplementary contracts with life contingencies $1,310,158; accidental death benefits $58,766; disability active lives $269,907; disability disabled lives $1,557,664; miscellaneous reserves $535,188; accident & health $7,199,448.

## SUMMARY OF OPERATIONS
### (in thousands of dollars)

| Premiums: | | Death benefits | 6,368,267 |
|---|---|---|---|
| Ordinary life | 3,881,127 | Matured endowments | 16,801 |
| Individual annuities | 4,250,506 | Annuity benefits | 3,658,763 |
| Group life | 7,724,146 | Disability benefits | 23,863 |
| Group annuities | 6,994,338 | Surrender benefits | 12,933,911 |
| Acc & health group | 3,865,808 | Group conversion | -802 |
| Acc & health other | 581,064 | Acc & health benefits | 2,750,514 |
| Industrial | 50,000 | Int on policy funds | 1,517,882 |
| Misc premiums | -1,719,649 | Supplementary contracts | 177,412 |
| Total premiums | 25,627,339 | Incr life reserves | -1,606,011 |
| Supplementary contracts | 138,698 | Incr a & h reserves | 1,138,569 |
| Net investment income | 10,596,748 | Change in reserves | 1,494,011 |
| Amort interest maint res | -21,382 | Commissions | 708,496 |
| Net gain from sep acct | 253 | Comm exp reins assumed | 31,538 |
| Comm & exp reins ceded | 411,801 | Insur taxes lic & fees | 393,407 |
| Res adj on reins ceded | -2,409,016 | General ins expenses | 2,815,736 |
| Other income | 819,074 | Net transf to sep acct | 740,073 |
| | | Misc operating expense | 554 |
| Total | 35,163,514 | Total | 33,162,984 |

**54**

Copyright © 2007, A.M. Best Company. All Rights Reserved
Reproduction and distribution of A.M. Best data to third parties is strictly



Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company



| | |
|---|---:|
| Gain from operations before FIT & div to policyholders | 2,000,530 |
| Dividends to policyholders: life | 182,869 |
| Dividends to policyholders: accident & health | 113 |
| Gains from operations after dividends to policyholders | 1,817,548 |
| Federal income taxes incurred | 521,075 |
| Net gain from operations after FIT and dividends | 1,296,474 |

## CASH FLOW ANALYSIS
### (in thousands of dollars)

| Funds Provided | | Funds Applied | |
|---|---:|---|---:|
| Gross cash from oper | 38,285,818 | Benefits paid | 28,707,890 |
| Long-term bond proceeds | 62,577,076 | Comm, taxes, expenses | 5,420,842 |
| Other invest proceeds | 11,187,606 | Long-term bonds acquired | 76,058,534 |
| Other cash provided | 19,153,223 | Other invest acquired | 18,972,078 |
| Decr cash & short-term | 252,555 | Other cash applied | 2,296,934 |
| Total | 131,456,278 | Total | 131,456,278 |

## INTERIM BALANCE SHEET
### (in thousands of dollars)

| Assets | 03/31/2007 | 06/30/2007 | 09/30/2007 |
|---|---:|---:|---:|
| Total bonds | 138,077,035 | 142,339,538 | 142,016,600 |
| Total preferred stocks | 7,242,770 | 8,107,917 | 8,431,897 |
| Total common stocks | 2,499,665 | 2,848,031 | 3,115,052 |
| Mortgage loans | 34,658,175 | 34,948,359 | 36,091,052 |
| Real estate | 3,554,006 | 3,556,330 | 3,562,174 |
| Contract loans | 5,502,312 | 5,530,657 | 5,576,925 |
| Cash & short-term inv | 1,572,663 | 1,893,850 | 2,691,033 |
| Other invested assets | 10,421,663 | 10,532,547 | 10,825,573 |
| Accrued invest income | 1,947,215 | 2,351,477 | 2,527,771 |
| Other assets | 8,417,336 | 8,160,876 | 9,265,254 |
| Tot assets w/o sep accts | 213,892,839 | 220,269,582 | 224,103,330 |
| Separate account bus | 73,465,638 | 77,136,833 | 79,620,380 |
| Assets | 287,358,477 | 297,406,415 | 303,723,711 |

| Liabilities | 03/31/2007 | 06/30/2007 | 09/30/2007 |
|---|---:|---:|---:|
| Net policy reserves | 114,484,719 | 114,769,951 | 114,926,971 |
| Liab for deposit-type contracts | 37,672,327 | 42,362,694 | 44,866,986 |
| Policy claims | 2,611,296 | 2,733,267 | 2,976,248 |
| Interest maint reserve | 293,670 | 262,164 | 226,863 |
| Comm taxes expenses | 1,573,242 | 1,582,114 | 1,650,742 |
| Asset val reserve | 3,272,359 | 3,432,842 | 3,263,975 |
| Contingency reserve | 1,108,540 | 1,030,338 | 1,025,716 |
| Other liabilities | 43,208,886 | 43,681,140 | 44,698,356 |
| Tot liab w/o sep funds | 204,225,039 | 209,854,511 | 213,635,856 |

Copyright © 2007, A M Best Company. All Rights Reserved
Reproduction and distribution of A. M. Best data to third parties is strictly

55

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
08704 - Metropolitan Life Insurance Company



Page 17

| | | | |
|---|---:|---:|---:|
| Separate account bus | 73,422,656 | 77,090,811 | 79,572,744 |
| Total liabilities | 277,647,695 | 286,945,322 | 293,208,601 |
| | | | |
| Common stock | 4,945 | 4,945 | 4,945 |
| Surplus notes | 1,397,830 | 1,397,830 | 1,397,830 |
| Paid in & contrib surpl | 5,785,924 | 5,785,924 | 5,785,924 |
| Special surplus funds | 350,131 | 352,056 | 353,477 |
| Unassigned surplus | 2,171,951 | 2,920,337 | 2,972,933 |
| Total | 287,358,477 | 297,406,415 | 303,723,711 |

## INTERIM SUMMARY OF OPERATIONS

| | Period Ended 09/30/2007 | Period Ended 09/30/2006 | Increase/ (Decrease) |
|---|---:|---:|---:|
| Prems & ann consid | 18,969,017 | 20,349,278 | -1,380,262 |
| Total premiums | 18,969,017 | 20,349,278 | -1,380,262 |
| | | | |
| Supplementary contracts | 96,002 | 103,314 | -7,312 |
| Net investment income | 8,572,950 | 7,681,922 | 891,028 |
| Amort interest main res | -512 | -13,467 | 12,955 |
| Net gain from sep acct | ... | 253 | -253 |
| Comm & exp reins ceded | 294,307 | 266,446 | 27,861 |
| Res adj on reins ceded | -1,622,423 | -1,918,565 | 296,142 |
| Other income | 679,447 | 624,354 | 55,093 |
| Total | 26,988,788 | 27,093,535 | -104,747 |
| | | | |
| Death benefits | 4,979,781 | 4,783,028 | 196,753 |
| Matured endowments | 13,726 | 12,712 | 1,013 |
| Annuity benefits | 2,681,795 | 2,767,281 | -85,486 |
| Surrender benefits | 9,173,678 | 10,051,595 | -877,917 |
| Disability and A&H ben | 2,315,182 | 2,088,193 | 226,989 |
| Group conversions | 291 | 417 | -125 |
| Int on policy funds | 1,493,748 | 1,083,350 | 410,398 |
| Supplementary contracts | 140,988 | 135,636 | 5,353 |
| Change in reserves | 495,519 | 1,639,576 | -1,144,057 |
| Commissions | 533,805 | 526,954 | 6,850 |
| Comm exp reins assumed | 12,537 | 23,804 | -11,266 |
| Insur taxes lic & fees | 299,688 | 290,540 | 9,148 |
| General ins expenses | 2,119,682 | 2,026,833 | 92,848 |
| Net transf to sep acct | 809,886 | 262,507 | 547,379 |
| Other disbursements | 43,734 | -7,506 | 51,240 |
| Total | 25,114,039 | 25,684,920 | -570,880 |
| | | | |
| Gain from operations before FIT & div to policyholders | 1,874,749 | 1,408,615 | 466,134 |
| Dividends to policyholders | 171,311 | 161,501 | 9,810 |

Copyright © 2007, A. M. Best Company.  All Rights Reserved.
Reproduction and distribution of A. M. Best data to third parties is strictly

**56**

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company

| | | | |
|---|---|---|---|
| Gain from operations after dividends to policyholders | 1,703,438 | 1,247,114 | 456,324 |
| Federal income taxes incurred | 289,173 | 301,243 | -12,069 |
| Net gain from operations after FIT and dividends | 1,414,264 | 945,871 | 468,393 |

## SEPARATE ACCOUNT DATA

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Sep Acct Assets | 71,574,580 | 64,769,122 | 60,579,640 | 54,642,188 | 46,979,756 |
| % Growth | 10.5 | 6.9 | 10.9 | 16.3 | -7.3 |
| S/A Assets/Adm Assets | 25.5 | 25.7 | 24.6 | 23.6 | 23.1 |
| | | | | | |
| Sep Acct Reserves | 65,570,619 | 59,571,234 | 55,461,439 | 50,588,223 | 43,619,597 |
| % Ordinary Life | 5.5 | 5.4 | 5.3 | 5.0 | 4.4 |
| % Individual Annuities | 24.3 | 22.3 | 21.1 | 19.6 | 17.6 |
| % Group Annuities | 55.0 | 59.0 | 60.5 | 62.0 | 64.8 |
| % Group Life | 15.2 | 13.3 | 13.2 | 13.4 | 13.3 |
| Deposit Type Liabilities | 4,728 | 13,671 | 13,011 | ... | ... |
| Other Liabilities | 5,957,454 | 5,153,810 | 5,056,934 | 3,937,942 | 3,253,422 |
| Sep Acct Surplus | 41,780 | 30,407 | 48,256 | 116,023 | 106,736 |
| | | | | | |
| S/A Prems & Deposits | 9,189,067 | 9,342,357 | 7,062,431 | 6,643,792 | 10,397,334 |
| % Ordinary Life | 5.7 | 5.8 | 7.9 | 7.6 | 5.2 |
| % Individual Annuities | 19.7 | 15.6 | 18.7 | 11.6 | 34.7 |
| % Group Annuities | 53.6 | 64.2 | 59.9 | 64.0 | 48.1 |
| % Group Life | 17.2 | 10.8 | 8.9 | 12.4 | 10.3 |
| % Other | 3.8 | 3.6 | 4.7 | 4.4 | 1.6 |
| | | | | | |
| Sep Acct Fees & Charges | 534,679 | 473,310 | 427,183 | 336,848 | 341,138 |
| % Ordinary Life | 11.5 | 12.3 | 13.0 | 15.6 | 16.5 |
| % Individual Annuities | 35.7 | 35.3 | 32.9 | 32.3 | 33.1 |
| % Group Annuities | 28.5 | 30.4 | 31.9 | 35.8 | 37.1 |
| % Group Life | 8.6 | 7.6 | 8.0 | 8.5 | 6.3 |
| % Other | 15.7 | 14.3 | 14.2 | 7.9 | 7.0 |
| Fees & Chgs to Assets | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 |
| | | | | | |
| Sep Acct Ben & Wdrwls | 8,618,486 | 8,372,294 | 6,372,240 | 6,293,274 | 980,147 |
| % Ordinary Life | 1.6 | 1.6 | 2.9 | 1.3 | 6.4 |
| % Individual Annuities | 17.0 | 14.5 | 16.9 | 13.7 | 31.2 |
| % Group Annuities | 77.2 | 75.6 | 71.0 | 74.4 | 49.3 |
| % Group Life | 2.4 | 7.4 | 7.7 | 9.1 | 13.1 |
| % Other | 1.8 | 1.0 | 1.5 | 1.5 | ... |
| Ben & Wdrwl to Assets | 12.6 | 13.4 | 11.1 | 12.4 | 2.0 |

## ORDINARY LIFE STATISTICS

57

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A. M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company                                                                                          Page 19

| Year | Ord. Lapse Ratio % | Average Ord. Policy (in dollars) Issued | In Force | Avg. Prem ($/M) | 1st Yr Prem / Total Prem | 1st Yr Comm / 1st Yr Prem | Gen. Exp. / Policies In Force |
|------|------|------|------|------|------|------|------|
| 2002 | 6.0 | 216,712 | 50,652 | 12.12 | 6.7 | 34.9 | 90.75 |
| 2003 | 6.0 | 242,964 | 53,328 | 11.72 | 6.2 | 28.0 | 102.03 |
| 2004 | 6.0 | 280,229 | 56,920 | 11.42 | 7.1 | 26.1 | 109.76 |
| 2005 | 5.2 | 293,969 | 62,159 | 10.80 | 8.1 | 28.5 | 108.85 |
| 2006 | 4.7 | 314,968 | 67,588 | 10.04 | 6.9 | 29.2 | 126.18 |

| Year | # Policies Issued (000) | # Policies in Force (000) | First Year Premium (000) | Gen'l Exp/ Reserves (%) | Return on Reserves (%) |
|------|------|------|------|------|------|
| 2002 | 149 | 8,115 | 332,082 | 1.70 | 0.54 |
| 2003 | 128 | 7,800 | 299,112 | 1.79 | 0.21 |
| 2004 | 131 | 7,407 | 341,621 | 1.81 | 0.29 |
| 2005 | 123 | 7,144 | 386,465 | 1.69 | -0.52 |
| 2006 | 95 | 6,949 | 325,240 | 1.89 | -0.35 |

Note: Ordinary excludes monthly debit ordinary accounts.

## INDIVIDUAL ANNUITY STATISTICS

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|------|------|------|------|------|------|------|
| 2002 | 10,093,359 | 32,144,030 | 0.8 | 5.3 | 30.4 | 9.0 |
| 2003 | 13,156,502 | 36,861,320 | 0.8 | 5.7 | 23.8 | 8.0 |
| 2004 | 13,590,853 | 40,680,245 | 0.9 | 6.3 | 27.5 | 8.7 |
| 2005 | 9,437,283 | 42,508,533 | 0.9 | 5.7 | 39.0 | 8.4 |
| 2006 | 10,483,021 | 45,389,504 | 1.1 | 6.1 | 44.7 | 10.1 |

\* Includes Separate Account reserves.

## GROUP ANNUITY STATISTICS

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|------|------|------|------|------|------|------|
| 2002 | 10,238,334 | 65,464,244 | 0.4 | 2.6 | 97.9 | 15.3 |
| 2003 | 12,615,046 | 73,370,852 | 0.5 | 3.0 | 74.0 | 12.7 |
| 2004 | 12,896,591 | 80,567,107 | 0.3 | 2.6 | 74.2 | 11.9 |
| 2005 | 14,379,461 | 86,733,045 | 0.3 | 2.6 | 79.1 | 13.1 |
| 2006 | 15,210,316 | 93,884,672 | 0.3 | 2.3 | 82.8 | 13.4 |

\* Includes Separate Account reserves.

## TOTAL ANNUITY ACTUARIAL RESERVES AND DEPOSIT TYPE LIABILITIES BY WITHDRAWAL CHARACTERISTICS

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly

Best's Insurance Reports - Life Health, US, 2007 Edition (2007 9-Month Supplement, Version 2007.3)
06704 - Metropolitan Life Insurance Company

| Year | Total Annuity Res & Dep Liab (000) | Min or No Surrender Charge (%)* | With Surrender Charge 5% or more (%)* | With MVA (%)* | No Surrender Allowed (%)* |
|------|------|------|------|------|------|
| 2002 | 100,453,423 | 48.5 | 1.6 | 8.3 | 41.7 |
| 2003 | 113,112,876 | 52.1 | 1.0 | 9.1 | 37.8 |
| 2004 | 124,051,669 | 43.6 | 2.4 | 9.7 | 44.3 |
| 2005 | 132,061,118 | 42.3 | 2.2 | 9.9 | 45.6 |
| 2006 | 143,345,000 | 40.5 | 1.8 | 10.1 | 47.6 |

* Includes Separate Account reserves.

## NEW LIFE BUSINESS ISSUED
### (in thousands of dollars)

| Year | Whole Life & Endow | Term | Credit | Group | Indus-trial | Total Insurance Issued | Non-Par (%) | Par (%) |
|------|------|------|------|------|------|------|------|------|
| 2001 | 17,185,509 | 15,560,572 | 309 | 141,993,848 | ... | 174,740,238 | 17 | 83 |
| 2002 | 15,324,353 | 16,981,326 | ... | 148,608,480 | ... | 180,914,159 | 18 | 82 |
| 2003 | 12,127,260 | 18,947,316 | ... | 145,585,658 | ... | 176,660,234 | 20 | 80 |
| 2004 | 13,359,153 | 23,315,216 | ... | 149,095,431 | ... | 185,769,800 | 24 | 76 |
| 2005 | 13,465,782 | 22,568,902 | ... | 150,700,054 | ... | 186,734,738 | 22 | 78 |
| 2006 | 12,303,936 | 17,713,433 | ... | 138,543,541 | ... | 168,560,910 | 94 | 6 |

## LIFE INSURANCE IN FORCE
### (in thousands of dollars)

| Year | Whole Life Endow & Adds | Term | Credit | Group | Industrial | Total Insurance In Force |
|------|------|------|------|------|------|------|
| 2001 | 283,926,888 | 120,450,774 | 1,568,398 | 1,480,945,061 | 3,212,213 | 1,890,103,334 |
| 2002 | 285,172,370 | 125,891,628 | 1,424,837 | 1,562,015,707 | 3,138,841 | 1,977,643,383 |
| 2003 | 279,509,598 | 136,433,624 | 1,346,039 | 1,716,250,410 | 3,061,719 | 2,136,601,390 |
| 2004 | 275,213,352 | 146,379,747 | 1,300,266 | 1,896,701,445 | 2,979,492 | 2,322,574,302 |
| 2005 | 280,895,645 | 163,142,845 | 1,300,266 | 2,145,863,201 | 2,896,285 | 2,594,098,242 |
| 2006 | 290,911,415 | 178,772,494 | 192,680 | 2,374,972,136 | 2,692,908 | 2,847,541,633 |

Copyright © 2007, A. M. Best Company. All Rights Reserved.
Reproduction and distribution of A. M. Best data to third parties is strictly

# EXHIBIT C

# California Business Portal

Secretary of State DEBRA BOWEN

| SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | OTHER SERVICES |

**Business Search Corporations**

| Printer Friendly Page |
| New Search |
| Search Tips |
| Field Definitions |
| Status Definitions |
| Name Availability |
| Corporate Records |
| Business Entities Records Order Form |
|   Certificates |
|   Copies |
|   Status Reports |
| FAQS |
| Corporations Main Page |
| Site Search |

# Corporations

The information displayed here is current as of "JUL 04, 2008" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| CALIFORNIA HUMAN DEVELOPMENT CORPORATION | | |
| Number: C0525802 | Date Filed: 4/28/1967 | Status: active |
| Jurisdiction: California | | |
| Address | | |
| 1945 RAMCO ST STE 195 | | |
| WEST SACRAMENTO, CA 95691 | | |
| Agent for Service of Process | | |
| MICHAEL J MICCICHE | | |
| 1945 RAMCO ST STE 195 | | |
| WEST SACRAMENTO, CA 95691 | | |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

EXHIBIT C

file://C:\Documents and Settings\jcc\Local Settings\Temporary Internet Files\OLK27A\Sh...   7/11/2008

# EXHIBIT D



> Home
> About CHD
> Our Partners
> Calendar
> Programs
> News
> Contact Us



**Volunteer**

**$ Donate**

# About CHD

### Welcome

A Welcome from the CEO Michael J. Micciche. Welcome to California Human Development . We are a nonprofit 501(c)(3) and provide human services in northern California. **more...**



### Mission Statement

Our Mission is to create paths and opportunities for those seeking greater self-sufficiency, independence and dignity through education, training, housing and other services. **more...**



### Our History

We serve the community by providing emergency services, family education programs, energy cost assistance, and immigration and citizenship assistance. **more...**

**61**

EXHIBIT D



## CHD Management

Includes more information about the management of CHD. **more...**



## CHD Office Locations

Includes information about our office locations. **more...**



home | about us | partners | events | programs | news | contact

Website Design by TerraCom Web Design

**62**

1

2

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4          I am employed in the County of Los Angeles, State of California.  I am over the age of
18 and not a party to the within action; my business address is:  Barger & Wolen LLP, 633 West
Fifth Street, 47ᵗʰ Floor, Los Angeles, California 90071-2043.

5          On **July 11, 2008,** I served the foregoing document(s) described as **DEFENDANT
METROPOLITAN LIFE INSURANCE COMPANY'S NOTICE OF REMOVAL;
DECLARATION OF MICHAEL A.S. NEWMAN** on the interested parties in this action by
placing [ ] the original [ ] a true copy thereof enclosed in sealed envelope addressed as stated in
the attached mailing list.

6

7

8                        Richard Johnston, Esq.
                     131-A Stoney Circle, Suite 500
9                       Santa Rosa, California  95401

10  **[ X ]  BY MAIL**

11     **[ X ]**     I am "readily familiar" with the firm's practice of collection and processing
                correspondence for mailing.  Under that practice it would be deposited with U.S. Postal
12              Service on that same day with postage thereon fully prepaid at Los Angeles, California in
                the ordinary course of business.  I am aware that on motion of the party served, service is
13              presumed invalid if postage cancellation date or postage meter date is more than one day
                after date of deposit for mailing in affidavit.
14

15  **[ ]  BY PERSONAL SERVICE**

16     [ ]  I caused such envelope to be delivered to a commercial messenger service with
            instructions to personally deliver same to the offices of the addressee on this date.
17

18  **[ ]  BY FACSIMILE**

       [ ]  By transmitting an accurate copy via facsimile to the person and telephone number as
19          follows:

20  **[ ]  BY E-MAIL**

21     [ ]  By transmitting an accurate copy(ies) via e-mail to the person(s) and e-mail address(es)
            as follows:
22

**[ X ]  (FEDERAL)**  I declare that I am employed in the office of a member of the bar of this
23                      Court at whose direction the service was made.  Executed at Los Angeles,
                        California on **July 11, 2008.**
24

25  NAME:  ROSA E. ROJAS

26

27

28                                      **63**

BARGER & WOLEN ᴸᴸᴾ
10 EAST 40TH STREET
40th FLOOR
NEW YORK, NY 10016
(212) 557-2800

i:\office7\7197\240\08pleadings\proof.doc